19029

CLYDE TURNER, Respondent, v. SINCLAIR REFINING
COMPANY, Appellant.

(173 S. E. (2d) 356)

*Messrs. Love, Thornton, Arnold & Thomason,* of Greenville, *for Appellant,*

*Messrs. Riley & Riley,* of Greenville, *for Respondent,*

38

March 20, 1970.

Bussey, Justice.

In this action for damages for personal injuries the jury returned a verdict for both actual and punitive damages in favor of the respondent Turner. Timely motions for non-suit, directed verdict and judgment *non obstante veredicto* were made by the appellant Sinclair Refining Co. and over-ruled, and the appeal is from the denial of such motions. Appellant contends that (1) there is no evidence of negligence on its part; (2) that respondent was barred from recovery by contributory negligence, willfulness, and/or assumption of risk; and (3) that there is no evidence of willfulness on the part of appellant which would support a verdict for punitive damages.

It is elementary that in determining whether the trial court acted properly in refusing the appellant's several motions, this court must view the evidence and the inferences reasonably deducible therefrom in the light most favorable to the respondent. We proceed to review the evidence and state the facts in the light of the foregoing principle. In the instant case there appear to be relatively few conflicts as to the facts, but there is sharp controversy as to the reasonable inferences deducible therefrom.

In 1953 appellant constructed and put into operation near Spartanburg a pipe line terminal where tank trucks or trailers of its customers were loaded with various types of petroleum fuel. Until November 1, 1966, the terminal was operated by a loading clerk in the employment of appellant, but on that date the terminal was converted to an automa-

tic self-loading one, with no attendant in constant or immediate charge thereof.

This terminal device consisted in part of a raised platform which, according to appellant, was eight feet high, but according to respondent's witnesses somewhat higher. At each end thereof there were steps leading to the platform. In the center of said platform there were pumps and seven downspouts for different types of fuel, each of which had a large weight on the end of it so connected that when not in use the downspout would be pulled back to the center of the roof over the platform. At one end of the platform there was a small office containing an electrical apparatus which activated the pumps.

The tanker trucks or trailers might be loaded from either side of this platform, and along each side thereof the deck or floor, where the drivers had to walk, was constructed of two metal plates, one above the other, two feet wide. The upper plate had holes punched in it two inches apart, the holes being punched upward approximately one-sixteenth of an inch, somewhat similar to a grater. The lower plate had holes punched in it at random every two feet, instead of every two inches. The idea of punching the holes in the upper plate upward was to improve traction, but there was evidence that the same had worn somewhat smooth through years of usage. The holes in both upper and lower plates were supposed to drain away any gasoline or fuel oil which might be spilled, but any spillage on the upper plate could not escape completely through the holes therein due to them being raised upward and could only escape completely by running off the sides onto the lower plate. With the relatively few holes in the under plate, any spillage had a tendency to collect on the lower plate and return to the upper plate, both through the holes and along the edges thereof, when the upper plate was stepped upon, but such condition was not noticeable to a casual observer. Along each side or edge of the platform there were four ropes approximately one and one-quarter inch in diameter, with knots tied

therein, which hung from the roof of the loading platform and which were installed by the appellant when the terminal was converted to an automatic self-loading device. The purpose of these ropes was to allow the drivers to swing from the platform over to the catwalks along the tops of the tankers, no other means being installed to aid the drivers in getting to and from their respective catwalks.

The terminal was located upon a sizeable lot which was surrounded by a fence, with a gate leading into the terminal grounds. The various drivers had keys to the lock on this gate so that the terminal could be utilized twenty-four hours a day. To load a tanker, the driver first had to ground his truck and then insert a plastic card into the electrical apparatus in the office building at the end of the platform for the purpose of activating the machinery. He then had to switch on the particular pump he wished to use, and thereafter he had to pull down the particular downspout he wished, usually with his right hand, and with his left hand grab the large rope to help stabilize himself and swing over to the top of the tanker. He then had to go along the catwalk, holding the downspout, open the dome of the particular compartment to be filled, insert the downspout and by pulling another rope, attached to the downspout, start the fuel flowing into the particular compartment. The downspout had to be held or tied down to prevent it from retracting to the center of the building.

The respondent Turner was a driver for Webster Oil Company, a customer of the appellant. Prior to February 6, 1967, respondent had considerable experience as a truck driver, but no experience with any self-loading device until shortly before that date. On two occasions prior to February 6, he went to the particular terminal in the company of another driver who showed him how to operate the self-loading device, and on one prior occasion he had gone by himself and operated the same .On the afternoon of February 6, he drove the tanker trailer outfit to the north side of the loading platform and went through the usual proced-

ure preparatory to loading. He had five compartments to load and, after loading three of them, moved his tanker forward in order to fill the last two compartments. After doing so, he went back up on the loading platform, took the appropriate downspout in his right hand, the large rope in his left hand, and attempted to swing over onto the tanker, and, due to having gotten oil on his shoe from the deck of the loading platform, slipped and fell. As he fell, he turned both the downspout and the large rope loose and was caught between the tanker and the platform, falling about four feet before so caught.

The height of the tanker above the platform was approximately two or two and a half feet, according to respondent's witnesses, but only about one foot, according to appellant's witness.

The tanker was oval in shape and all witnesses agree that the side of the tanker was about eighteen inches from the platform at the time. Admittedly, respondent could have parked a few inches closer to the edge of the platform had it not been for an exhaust stack which protruded from his tractor slightly to the rear and right of the cab, but due to the level of the platform being lower than the top of the tanker, could not have parked the tanker near enough to the edge of the platform to be able to step from the platform onto the catwalk. There was evidence to the effect that the platform, built in 1953, was designed at a sufficient height to allow tankers commonly in use at that time to park much closer with a portion of the side of the tanker being actually underneath the platform, but that the height was not sufficient to so accommodate modern tankers. Appellant's sole witness admitted that the self-loading terminal would have been much safer for the use of the drivers had the platform been constructed at sufficient height so that a tanker could be parked at least partially beneath the platform.

The evidence rather clearly discloses, we think, that the appellant maintained an automatic loading device for the use

of its customers' drivers which was, to say the least, hazardous in that the platform was out of date and not of sufficient height for modern tankers, and in that no means was provided for the drivers to get from the platform to their respective catwalks, except by swinging thereunto by a rope while holding onto a downspout with one hand. There is evidence that the various downspouts leaked from time to time while in use, spilling fuel on the deck of the platform, and it is inferable that the respondent knew this fact prior to his injury. Despite such fact, the appearance of the deck, without a minute examination thereof, was such as might lead a person of ordinary care and prudence to believe that any leakage or spillage that occurred would drain through the holes in the deck and disappear. The respondent had been to the premises on three occasions prior to the date of his injury, but testified that on each occasion his attention had been directed primarily to learning how to operate the automatic loading device and that he paid no particular attention to the deck of the platform. He further testified to the effect that, generally speaking, the terminals with which he was familiar were kept free of spilled fuel. It is inferable from his testimony and the other evidence that he did not anticipate and did not observe, prior to the accident, the latent condition which actually caused the trapped oil to get upon his shoe or shoes and caused or contributed directly to his injury.

In view of the foregoing facts and inferences reasonably deducible therefrom, we have no difficulty in disposing of appellant's contention that there was no evidence of negligence on its part. Respondent was a business invitee of the appellant and, while the appellant was not an insurer of his safety, there was a duty on the part of the appellant to exercise due care to keep the premises in reasonably safe condition and to give warning of any latent perils. Such is the established rule of law in this jurisdiction and requires no specific citation of authority. See various cases collected in West's South Carolina Digest, Negligence, 32.

The question of whether or not respondent should be barred from recovery by contributory negligence or willfulness and/or assumption of risk is argued by the parties as a single question, and we shall discuss the same accordingly. With respect to assumption of risk, if a plaintiff freely and voluntarily enters into some relation with the defendant which presents obvious danger, plaintiff will be regarded as impliedly agreeing to look out for himself and to relieve the defendant of responsibility. See cases collected in West's South Carolina Digest, Negligence, 105. If we assume, without necessarily deciding, that the respondent assumed the obvious risk incident to the distance from the edge of the platform to the catwalk and the risk of swinging this distance with the aid of a hanging rope, such assumption is not dispositive of the case. The question still remains whether the risks which he so assumed were or were not the proximate cause of his injury. It is reasonably inferable, we think, that the defective condition of the platform with the trapped oil, rather than any assumed risk, was the proximate cause of the resulting injury, the cause but for which no injury would have occurred.

If we assume that respondent was negligent in failing to observe the oily condition of the deck, or in any other particular, the question still remains whether he was guilty of only simple contributory negligence or of willfulness, as simple contributory negligence is, of course, not a bar to recovery in a case where there is willfulness on the part of a defendant. We conclude that, under all of the circumstances, the evidence presented jury issues as to the proximate cause of respondent's injury and whether or not he should be barred from recovery on the ground of either contributory negligence or willfulness, or assumption of risk.

The contention that there was no evidence of willfulness on the part of the appellant which would support a verdict for punitive damages is readily answered. Viewing the evidence in the light most favorable to respond-

ent as we are required to do, the appellant maintained a terminal facility which, under any circumstance, was hazardous to the drivers in that the tankers could not be parked so as to bring the catwalks on the top thereof in near proximity to the edge of the platform, and no reasonably safe means was provided for the drivers to get back and forth between the platform and their respective catwalks. In addition to these factors, there was added latent peril arising from the construction of the deck of the platform, with no warning being given to such latent peril. It is clearly inferable that appellant had full knowledge of not only the obvious perils, but the latent peril. Willfulness is the conscious failure to use due care, and, in brief, we think there was abundant evidence here of conscious failure on the part of the appellant to exercise due care for the safety of the various drivers, including, of course, the safety of the respondent.

The exceptions of the appellant are, in our view, all without merit, and the judgment of the lower court is, accordingly,

Affirmed.

Moss, C. J., and Lewis, Brailsford and Littlejohn, JJ., concur.