22300

George Blanton EASLER, Respondent, v. HEJAZ TEMPLE A∴A∴O∴N∴M∴S∴OF GREENVILLE, S. C., an unincorporated association; and The Imperial Council of the Nobles of the Mystic Shrine of North America, an Iowa Corporation, Appellants. Janice G. EASLER, Respondent, v. HEJAZ TEMPLE A∴A∴O∴N∴M∴S∴OF GREENVILLE, S. C. , an unincorporated association; and The Imperial Council of the Nobles of the Mystic Shrine of North America, an Iowa Corporation, Appellants.

(329 S. E. (2d) 753)

Supreme Court

*William M. Grant, Jr., W. Benjamin McClain, Jr.,* and *O. G. Calhoun,* all of *Haynsworth, Perry, Bryant, Marion & Johnstone,* Greenville, *for appellants.*

*J. Bruce Foster; George F. Abernathy* and *Billy C. Terry,* both of *Odom, Terry, Abernathy & Cantrell;* and *Ben C. Harrison* of *Burts, Turner, Hammett, Harrison & Rhodes,* all of Spartanburg, *for respondents.*

Heard March 12, 1985.

Decided April 25, 1985.

CHANDLER, Justice:

Hejaz Temple A.·.A.·.O.·.N.·.M.·.S.·.(Hejaz) and the Imperial Council of the Nobles of the Mystic Shrine of North America (Council) appeal from jury verdicts received by Respondent George Blanton Easler (Easler) for actionable negligence, and by Easler's wife (Wife) for loss of consortium.

We affirm.

## BACKGROUND FACTS

Easler, a candidate for Hejaz membership, was injured during a "hazing" event which was part of initiation ceremonies.

The event directly involved is known as the "mattress-rotating barrel trick." It requires each candidate to slide down an eight to nine foot high metal board onto mattresses which, with connecting mattresses, lead to a barrel over which the candidate is required to climb. Members of Hejaz stand on each side of the mattresses and barrel and fun-paddle candidates enroute to the barrel, and assist those who fall.

While negotiating this event Easler tripped and, instead of surmounting the barrel, fell headlong into it, causing a damage-producing neck injury.

At the conclusion of a five-day trial Easler received a verdict of $361,800.00, and Wife a verdict of $37,500.00.

## ISSUES

Summarizing the exceptions, Hejaz and Council contend:

(1) Easler's own negligence was the sole proximate cause of his injury.
(2) Easler assumed the risk.
(3) Hejaz is an unincorporated association, so that Easler, as a member of the association, is barred from recovery.
(4) Hejaz was not the agent of Council.
(5) The testimony of D. W. Bradbury was inadmissible.
(6) The testimony of Richard Petty was inadmissible.
(7) The verdicts were excessive.

## I. NEGLIGENCE AND PROXIMATE CAUSE

Hejaz and Council contend that the record contains no evidence of actionable negligence on their part and that Easler's own negligence solely caused his injury. We disagree.

The evidence discloses that the mattresses leading to the barrel were stacked two deep, not fastened to the floor and were loosely connected. When a candidate completed his slide onto the first set of mattresses, the abutting mattresses would rise, creating an unevenness which contributed to tripping. It was testified that this condition was easily correctible: the mattresses could have been fastened to the floor, securely connected and a single canvas placed over them.

It is elementary that when more than one reasonable inference may be drawn from the evidence the matter is one for the jury, not the court and, further, that motions asserting the absence of any negligence must be viewed in the light most favorable to the party against whom made. *Mahaffey v. Ahl*, 264 S. C. 241, 246, 214 S. E. (2d) 119 (1975), citing *Cantrell v. Carruth*, 250 S. C. 415, 418, 158 S. E. (2d) 208 (1967).

Here, the jury was entitled to find that the manner in which Hejaz carried out the "mattress-rotating barrel trick" was hazardous and constituted actionable negligence.

## II. ASSUMPTION OF RISK

Hejaz and Council contend that Easler is barred from recovery by the doctrine of assumption of risk. We disagree.

The decisions of our Court hold uniformly that, in order for the doctrine to apply and bar recovery, the injured party must have "freely and voluntarily exposed [him]self to a *known danger* of which [he] understood and appreciated the danger." *King v. Daniel International Corporation*, 278 S. C. 350, 354, 296 S. E. (2d) 335 (1982); *Canady v. Martschink Beer Distributors, Inc.*, 255 S. C. 119, 177 S. E. (2d) 475 (1970); *Turner v. Sinclair Refining Company*, 254 S. C. 36, 173 S. E. (2d) 356 (1970).

The record contains sufficient evidence from which the jury could conclude that the danger which brought about his injury was not understood and appreciated by Easler. For example, the effect of the unevenness of the connecting mattresses was testified to by Walter Johnson, a witness for Easler:

Q. Mr. Johnson, did you see what Mr. Easler tripped on?

A. The mattress. Yes, I saw him.

Q. You saw his foot catch on it?

A. Yes, when he stepped at or near between the two (2) mattresses, *one (1) went down and his foot tripped on the mattress.* [Emphasis supplied.]

Hejaz and Council rely upon *House v. European Health Spa*, 269 S. C. 64, 239 S. E. (2d) 653 (1977). In *House* the evidence was undisputed that the plaintiff exposed herself to a risk of which she was fully aware. Here, while Easler was aware that he was participating in a hazing type activity, the jury could find from the evidence that his knowledge did not extend to a danger understood and appreciated by him.

*House* is not applicable here.

## III. MEMBER OF UNINCORPORATED ASSOCIATION

Hejaz contends that Easler, as a member himself of the association, was engaged in a joint and common enterprise which bars him from recovery.

Directed verdict and judgment *n.o.v.* motions by Hejaz on this issue were properly refused by the trial judge, as the testimony relating to Easler's membership status at the time of injury was in conflict.

Likewise, the trial judge properly refused to charge the jury that members of an unincorporated association may not recover from the association for tortious conduct of other association members. While this may be a correct statement of law, such a charge here presumes that Easler was officially a member at the time of injury, an evidentiary fact in dispute.

Accordingly, this exception is without merit.

## IV. AGENCY OF HEJAZ

Hejaz and Council contend that, as a matter of law, Hejaz was not the agent of Council. We disagree.

"The test to determine agency is whether or not the purported principal has the *right to control* the conduct of his alleged agent." *Fernander v. Thigpen*, 278 S. C. 140, 144, 293 S. E. (2d) 424 (1982).

When *Fernander* is applied to the evidence here, it becomes patent that directed verdict and judgment *n.o.v.* motions were correctly denied. Based upon the record the trial judge stated in his order, and understandably, that "the evidence presented was not so clear and convincing that the court probably should have held as a matter of law that Hejaz Temple was an agent of the Imperial Council."

The jury's finding on agency is supported by substantial evidence, typical of which is the testimony of witness Jack Tyner, a former potentate and present treasurer of Hejaz Temple:

A. ... I served as potentate in 1969, which the previous five (5) years I had served up the ladder. In 1973, I was elected Treasurer, and I've been Treasurer ever since.

Q. You are Treasurer of Hejaz Shrine Temple?

A. Yes.

Q. Now, what does the word "Potentate" imply, or what are the responsibilities of the Potentate?

A. The Potentate is responsible for the government of Hejaz Shrine Temple for his year as Potentate.

Q. *And he is responsible to the national organization?*

A. *Yes.*

\* \* \* \* \* \*

Q. Mr. Tyner, what control does the national organization have over Hejaz Shrine Temple and how does it exercise that control?

A. We're governed by a set of by-laws.

Q. Are a copy of those here today?

A. Yes, there's a copy here.

Q. And you're talking about the by-laws of *the national corporation.*

A. *Yes.*

Q. And are there articles of incorporation for the *national corporation?*

A. *Yes.*

\* \* \* \* \* \*

Q. Let me ask you, Mr. Tyner, if you will, just tell us *who decides the location of a temple?*

A. *The Imperial Council.*

Q. The Imperial Council.

A. Yes.

Q. Can you *move your temple without their permission?*

A. *No, sir.*

Q. Who decides on the *qualifications of a member of Hejaz Temple?*

A. *The Imperial Council* and its representatives.

Q. Who decides *how many meetings you will have a year and when you can call a special meeting?*

A. *The Imperial Council.*

Q. Who decides *the method by which you ballot on candidates for admission?*

A. *The same.*

Q. Who decides on *the qualifications of the officers?*

A. *The Imperial Council.* [Emphasis supplied].

## V. TESTIMONY OF WITNESS BRADBURY

Over objection of Hejaz and Council the trial judge admitted the expert witness testimony of D. W. Bradbury concerning Hejaz's negligence.

Bradbury, a professor at Clemson University, holds undergraduate and master's degrees in mechanical engineering. Since 1948 he has also been a consultant in design of buildings and structures, including floors, walks and steps. He teaches safety engineering.

The objection is addressed, not to Bradbury's qualification, but to the claim that his testimony relates to a matter of common knowledge and is not, therefore, a proper subject for expert testimony. We disagree.

The "mattress-rotating barrel trick" involves slides, connecting mattresses, barrels, running, distances and climbing, and the manner in which each contributes to the procedure. Expert testimony was clearly relevant to the issue of safety.

Mr. Bradbury, in answer to a hypothetical question, the form of which has been approved by this Court, testified that the trick, as required to be performed, was dangerous. He then described in detail the reasons for his opinion and steps which should have been taken to make it safe.

The testimony was competent and properly admitted.

## VI. TESTIMONY OF WITNESS PETTY

Hejaz and Council contend the trial judge erred in admitting the expert testimony of Richard Petty, a witness presented by Easler on the issue of damages. They assert that Petty lacked qualification as an expert in the area about which he testified. We disagree.

Petty's challenged testimony related to future damages, current interest yields and inflation rates.

The record discloses that Petty holds a college B.S. degree in marketing and business; that he worked in production planning and marketing with Milliken and Company for six years; that the business firm he now owns engages in financial and estate planning and in the sale of annuities; that he works with the trust departments of all Spartanburg banks in financial planning for the future.

The trial judge found correctly that Petty was qualified as an expert to testify upon the issue of damages.

## VII. EXCESSIVENESS OF VERDICTS

Finally, Hejaz and Council contend that the verdicts were contrary to the preponderance of the evidence, entitling them to a new trial absolute *or*, in the alternative to a new trial *nisi*, in that they were the result of bias, prejudice, caprice or passion, or other consideration not founded upon the evidence. We disagree.

When verdicts are challenged as excessive, this Court has distinguished between those unduly liberal and those actuated by passion, caprice or prejudice.

(1) *The unduly liberal verdict:*
Where the verdict is deemed excessive by the trial judge, in the sense that it indicates merely undue liberality on the part of the jury, the trial judge *alone* has the power, and with it the responsibility, of setting aside the verdict absolutely or reducing it by the granting of a new trial *nisi.* [Emphasis supplied].

*Young v. Warr,* 252 S. C. 179, 187, 165 S. E. (2d) 797 (1969), citing *Gray v. Davis,* 247 S. C. 536, 148 S. E. (2d) 682 (1966).

(2) *The verdict actuated by passion, caprice or prejudice:*
It is only when the verdict is so grossly excessive and the amount awarded so shockingly disproportionate to the injuries as to indicate that the jury was moved or actuated by passion, caprice, prejudice, or other consideration not found on the evidence that it becomes the duty of this court, as well as of the trial court, to set aside the verdict absolutely.

*Young, supra,* citing *Ray v. Simon,* 245 S. C. 346, 140 S. E. (2d) 575 (1965).

Accordingly, this Court will not set aside a verdict for its possibly undue liberality.

Nor do we find abuse of discretion by the trial judge, amounting to error of law, in refusing to set the verdict aside absolutely. When the record is reviewed, this verdict, assuming its liberality, is not so excessive as to indicate that the jury was actuated by passion, caprice or prejudice.

At the time of injury Easler, age 37 and father of four children, was a carpenter-construction contractor in good

health with annual earnings averaging over $15,000.00 for the preceding five years. Dr. Darwin Keller, testifying for Hejaz as a neurosurgeon specialist, described him as a good athlete, "outstanding" softball player and "diligent family man." His life expectancy was over 37 years.

The injury to Easler's neck was severe, resulting in a displacement forward of cervical vertebra number six (C-6) beyond number seven (C-7). When he failed to respond to conservative therapy a fusion of cervical vertebrae six and seven was performed. He has considerable limitation of motion and, according to medical witnesses, will be restricted in his activites as a carpenter. The pain from which he suffers is aggravated and intensified by neck movement.

Dr. Ballenger, to whom Easler was referred by Dr. Keller, was not called as a witness. However, on cross-examination Dr. Keller testified that he was given a written opinion by Dr. Ballenger that Easler had suffered a spinal cord injury.

Although not interpreted on initial x-rays, Dr. John Featherstone, a specialist in radiology, testified that Easler's injury included a small fracture of thoracic vertebra number one (T-1).

Easler's injury is described graphically by Dr. J. A. McCarthy, orthopedic surgeon:

Q. What is your opinion as to the problems that Mr. Easler will have with his neck in the future?

A. First of all, I think the man already has a serious problem. He has severe loss of motion. He has severe degrees of pain. Any stress situation that requires the neck, the pain is going to be worse. This exists right now. And as far as I am concerned, it just about incapacitates him from doing most anything, be it work or play or what-have-you ... And, hence, he's going to develop rather severe arthritic changes in the neck at a fairly rapid rate which is going to lead to further pain and even further limitation of his motion.

Q. In your opinion will Mr. Easler ever be able to engage in gainful employment?

A. ... I can only state that he, in my opinion, is severely impaired and thereby is limited severely in what job activities he can do from an orthopedic standpoint.

358

The effect of the injury upon Easler's future employment was addressed directly by expert witness Dr. Benson Hecher, a consultant in vocational testing and job placement:

Q. Would you tell us what that opinion is?
A. Based on Mr. Easler's age, his condition, work history, transferable skills and medical records it is my opinion that Mr. Easler is unable to perform any substantial gainful work activity in open competition with others.

Finally, the injury has resulted in psychiatric problems, requiring the treatment of a specialist in that field. According to Dr. Robert Ford, Easler suffers from depression, secondary to situational pressures, including financial problems brought on by his inability to work. He will, in Dr. Ford's opinion, require treatment in the future "[a]t least over several years."

With reference to Wife's action for loss of consortium, Hejaz's contention that it is based upon insufficient evidence is without merit.

## CONCLUSION

It was for the jury to weigh the evidence, determine witness credibility and reach a verdict. A search of the entire record reveals nothing to suggest that any party failed to receive a fair and impartial trial.

Affirmed.

LITTLEJOHN, C. J., and NESS, GREGORY and HARWELL, JJ., concur.