# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Beverly Dale Jolly and Brenda Rice Jolly, Respondents,

v.

Fisher Controls International, LLC and Crosby Valve, LLC, Petitioners.

Appellate Case No. 2022-000272

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal from Spartanburg County
Jean Hoefer Toal, Acting Circuit Court Judge

---

Opinion No. 28233
Heard February 6, 2024 – Filed August 21, 2024

---

## AFFIRMED

---

C. Mitchell Brown and Allen Mattison Bogan, both of Nelson Mullins Riley & Scarborough, LLP, of Columbia, for Petitioners.

Theile Branham McVey and John D. Kassel, of Kassel McVey, of Columbia; Jonathan Marshall Holder and Lisa White Shirley, of Dean Omar Branham, LLP, of Dallas, TX, all for Respondents.

Caroline Marie Gieser, of Shook, Hardy & Bacon, of Atlanta, GA, for Amicus Curiae American Tort Reform Association.

---

**JUSTICE FEW:** There are two categories of issues in this case. The first involves a civil trial court's power to grant a motion for a new trial *nisi*. We find the trial court applied the correct standard for decision in granting the plaintiffs' motion for a new trial *nisi additur*, acted within its discretion in finding the jury verdict inadequate, and followed the proper procedure by permitting the non-moving party to reject the *nisi* amount in favor of a new trial. The second involves a non-settling defendant's right to have the proceeds of pretrial settlements set off against the jury's verdict. We find the trial court acted within its discretion in allocating the proceeds of the pretrial settlements between the various claims for the purpose of setoff. We affirm.

# I

Beverly Dale Jolly worked for Duke Power Company as an inspector at the Oconee, McGuire, and Catawba nuclear plants between 1980 and 1984. Dale oversaw a team of tradesmen during this time who replaced gaskets and valves on large pipes in the nuclear plants. He testified his crew used grinders and other abrasives to clean flanges and remove old gaskets, creating dust that he inhaled. These valves and gaskets—many of which were manufactured by petitioners Fisher Controls International, LLC and Crosby Valve, LLC—were made of or contained asbestos.

In 2016, Dale was diagnosed with mesothelioma. He and his wife Brenda then sued numerous defendants alleging each designed or sold asbestos-containing products that exposed Dale to asbestos throughout his life and caused his cancer. The Jollys settled before trial with all defendants except Fisher and Crosby for a total settlement value of $2,270,000.

Dale tried his personal injury claim and Brenda jointly tried her loss of consortium claim to a jury. The jury returned verdicts in the Jollys' favor, awarding Dale $200,000 and Brenda $100,000. The Jollys filed a joint motion for a new trial *nisi additur*, asserting both verdicts were inadequate. Neither party asked for a new trial absolute. The trial court granted the Jollys' motion for a new trial *nisi additur* and increased Dale's verdict to $1,580,000 and Brenda's verdict to $290,000. The trial

court's order provided, "Defendants may, of course, reject the *additur*, and a new trial will be scheduled." Fisher and Crosby filed a motion for setoff—among other post-trial motions not relevant to this appeal—which the trial court granted in part and denied in part.

Fisher and Crosby appealed raising what the court of appeals called "multitudinous arguments" on numerous issues. *Jolly v. Gen. Elec. Co.*, 435 S.C. 607, 620, 869 S.E.2d 819, 826 (Ct. App. 2021). The court of appeals affirmed. *Id.* We granted Fisher's and Crosby's petition for a writ of certiorari on only two questions: whether the trial court erred in granting the Jollys' motion for a new trial *nisi additur* and whether the trial court erred in denying in part Fisher and Crosby's motion for setoff.

## II

We address the *additur* issue in three aspects. First, we consider and clarify the standard of decision and procedure for the trial court in ruling on a motion for a new trial *nisi*. Next, we apply those principles to the trial court's ruling in this case. We conclude the trial court adhered to those principles and otherwise acted within its discretion. Finally, we explain that the party aggrieved by a new trial *nisi* order may appeal the ruling before electing whether to accept the *nisi* amount or have a new trial.

## A

We have long held that a trial court has the authority to grant a new trial *nisi additur* or *remittitur* when it finds the amount of the verdict to be inadequate or excessive. *See, e.g.*, *O'Neal v. Bowles*, 314 S.C. 525, 527, 431 S.E.2d 555, 556 (1993) ("The trial judge . . . has the power to grant a new trial *nisi* when [s]he finds the amount of the verdict to be merely inadequate or excessive."[1]) (citing *Easler v. Hejaz Temple A.A.O.N.M.S. of Greenville*, 285 S.C. 348, 356, 329 S.E.2d 753, 758 (1985)); *Warren v. Lagrone*, 12 S.C. 45, 53 (1879) (stating a trial court may grant a new trial *nisi*

---

[1] We omitted the word "alone" from this quotation because it is not part of the trial court's standard for decision on a motion for a new trial *nisi*. This Court used the word in *O'Neal* to distinguish between the trial court's authority to grant a new trial *nisi* and an appellate court's lack of such authority. Thus, we stated, "The trial judge *alone* has the power to grant a new trial *nisi* . . . ." *Id.* (emphasis in original).

*remittitur* "[w]hen the damages awarded by the jury appear to the judge to be excessive"). This "merely inadequate or excessive" standard distinguishes cases in which a trial court may grant a new trial *nisi* from cases in which the trial court may not do so because the verdict is "grossly inadequate or excessive," indicating the verdict was not based on the evidence and the law. Stated another way, "When a party moves for a new trial based on a challenge that the verdict is either excessive or inadequate, the trial judge must distinguish between awards that are merely unduly liberal or conservative and awards that are actuated by passion, caprice, or prejudice." *Riley v. Ford Motor Co.*, 414 S.C. 185, 192, 777 S.E.2d 824, 828 (2015) (quoting *Allstate Ins. Co. v. Durham*, 314 S.C. 529, 530, 431 S.E.2d 557, 558 (1993)). *See also* Harry M. Lightsey & James F. Flanagan, *South Carolina Civil Procedure* (2nd ed. 1985) (explaining the "grossly inadequate or excessive" standard is met where "the result [of trial is] so unusual that the Court must infer that the jury's deliberations were improperly affected and cast doubt not only on the amount of damages returned but also on the determination of liability"). It is only when the trial court deems the verdict inadequate or excessive—but not grossly so—that the trial court has the authority to grant a new trial *nisi*.

In determining whether any verdict is inadequate or excessive, however, the court must give "substantial deference" to the jury's determination of damages. *Rush v. Blanchard*, 310 S.C. 375, 379, 426 S.E.2d 802, 805 (1993) (citing *Brabham v. S. Asphalt Haulers, Inc.*, 223 S.C. 421, 430, 76 S.E.2d 301, 306 (1953)); *Harrison v. Bevilacqua*, 354 S.C. 129, 140, 580 S.E.2d 109, 115 (2003). The necessity of giving this deference arises from article I, section 14 of the South Carolina Constitution, which provides, "The right of trial by jury shall be preserved inviolate." S.C. CONST. art. I, § 14. Thus, every party to a civil jury trial "is entitled to the constitutional privilege of the fair judgment of a jury" and a court must "not interfere with the verdict of a jury simply because it is greater [or less] than its own estimate." *Brabham*, 223 S.C. at 430, 76 S.E.2d at 306.

We have explained in recent years that the trial court must justify its ruling by giving "compelling reasons" for invading the jury's province. *See, e.g.*, *Riley*, 414 S.C. at 193, 777 S.E.2d at 829 (quoting *Bailey v. Peacock*, 318 S.C. 13, 14, 455 S.E.2d 690, 691 (1995)). The "compelling reasons" language first appeared in opinions dealing with new trials *nisi* in 1984 in the court of appeals' opinion in *Haskins v. Fairfield Electric Co-op.*, 283 S.C. 229, 321 S.E.2d 185 (Ct. App. 1984). In *Haskins*, the court of appeals wrote—without citation—"compelling reasons must be stated in the order as to why it was necessary to invade the jury's province in this manner." 283 S.C. at

236, 321 S.E.2d at 190. The court of appeals repeated the language in *Jones v. Ingles Supermarkets, Inc.*, 293 S.C. 490, 492, 361 S.E.2d 775, 776 (Ct. App. 1987), and this Court first used the language in *Pelican Building Centers of Horry-Georgetown, Inc. v. Dutton*, 311 S.C. 56, 427 S.E.2d 673 (1993). We stated, "A new trial *nisi additur* may be ordered when the verdict is . . . insufficient based on the evidence. However, compelling reasons must be given justifying invading the jury's [province] in this manner." 311 S.C. at 61, 427 S.E.2d at 676 (citing *Jones*, 293 S.C. at 492, 361 S.E.2d at 776). Neither this Court nor the court of appeals has explained where the "compelling reasons" requirement came from nor what it means.

We now clarify that—like the "substantial deference" requirement—the requirement that a trial court give compelling reasons to justify invading the province of the jury derives from the constitutional right to a civil jury trial. In fact, these two requirements are essentially parts of the same principle—that trial courts must honor the sanctity of a jury's verdict. Substantively, the trial court must give substantial deference to the jury in deciding whether the verdict is inadequate or excessive. Procedurally, if the trial court determines the jury's verdict is inadequate or excessive, it must explain the reasons it made that determination, and those reasons must be compelling. The two requirements apply in all situations in which the trial court is considering a new trial *nisi* or absolute. In combination, the two requirements reflect the solemn importance of the jury trial in civil cases and demonstrate the respect this Court has always shown for a jury's determination of damages. The two requirements ensure the circuit courts will also show that respect in ruling on motions for a new trial based on the inadequacy or excessiveness of a verdict. *See Bodie v. Charleston & W. Carolina Ry. Co.*, 66 S.C. 302, 314, 44 S.E. 943, 947 (1903) (stating trial "courts should cautiously exercise the right to grant new trials for inadequacy in the amount of the verdict"). The trial court's explanation must be on the record and—if the ruling is appealed—the appellate court will review the explanation to determine whether the ruling was within the trial court's discretion.

If the trial court grants either a new trial *nisi additur* or *remittitur*, it is then required to give the non-moving party the choice—as the trial court did here—between the *nisi* damages amount and a new trial on all issues.[2] *Anderson v. Ætna Cas. & Sur.*

---

[2] *See* S.C. Code Ann. § 15-33-125 (2005) ("Unless the plaintiff is entitled to a directed verdict on the issue of liability, any new trial must include both issues of liability and damages."). Section 15-33-125 superseded in part our decisions in

*Co.*, 175 S.C. 254, 281, 178 S.E. 819, 829 (1934) (citations omitted) ("Although the court may amend a verdict, the amendment must be accompanied with an option of a new trial *nisi* to the party against whom amendment militates."); *Graham*, 282 S.C. at 402, 321 S.E.2d at 45 ("The option must be given."). Because of a party's right "to have the amount of damages determined by a jury," it is error to alter "the amount of the verdict without allowing the [non-moving party] the option of a new trial nisi." *Gwathmey v. Foor Hotel Co.*, 121 S.C. 237, 242, 113 S.E. 688, 689 (1922).

**B**

The trial court in this case explained that it granted the Jollys' motion for a new trial *nisi additur* because it believed $200,000 for Dale's personal injuries and $100,000 for Brenda's loss of consortium were inadequate awards. To begin its explanation, the trial court interpreted Dale's verdict and concluded the jury intended to award him $142,000 for medical expenses and $58,000 in noneconomic damages. Fisher and Crosby argue the trial court had no valid basis for interpreting the verdict in this way and impermissibly speculated about the jury's verdict. We disagree. As an initial point, we do not see this "interpretation" as particularly important to the trial court's determination that the verdict was inadequate. Even so, we find no error in the trial court's use of its interpretation as the first step in articulating its explanation of "compelling reasons." Dr. Arthur Frank, the Jollys' expert witness on mesothelioma, testified that some of Dale's medical bills totaled $142,000. The trial court was permitted to rely on that testimony in its effort to determine whether it must defer to the jury's verdict.

Continuing its explanation, the trial court emphasized in its order that "Dr. Frank testified, *without dispute*, that the total cost of [Dale's] past and future medical care, from the time of his diagnosis to the time of his death, would reasonably be $1,000,000." If that testimony is accurate, it would clearly be within the trial court's discretion to find a $200,000 award inadequate. The record supports the trial court's conclusion the testimony was accurate, in part because Fisher and Crosby barely questioned Frank's estimate, and they presented no evidence of a different cost. Further, Fisher and Crosby's own expert witness acknowledged the very substantial

---

*Industrial Welding Supplies, Inc. v. Atlas Vending Co.*, 276 S.C. 196, 201, 277 S.E.2d 885, 887 (1981), and *Graham v. Whitaker*, 282 S.C. 393, 400, 321 S.E.2d 40, 44 (1984), which allowed for new trials solely as to damages.

care Dale had already received and would eventually need, although he declined to testify about its cost. Thus, it was within the trial court's discretion to rely on Frank's testimony in determining the jury's award was inadequate.[3]

The trial court also considered Dale's non-economic damages. The trial court gave a detailed explanation of the significant pain Dale suffered due to his disease and treatment. The court described the decortication surgery during which doctors cut out one of his ribs so they could scrape the lining of his lung and remove as much of his cancer as possible. It took Dale months of rehabilitation after the decortication surgery just to be able to walk, or even breathe without supplemental oxygen. Dale testified that at the time of trial he was receiving an experimental treatment that "brings you to your knees." He was given that treatment after three rounds of debilitating chemotherapy.

All of those painful procedures were in addition to his personal and social losses as his life "came to a halt" after his diagnosis. Dale had to quit the job he enjoyed, was unable to work in the three-acre garden he had maintained for decades before, and could no longer go to church or have friends over for dinner. Instead, he had to attend medical appointments often several times every week. In addition to all of that, Dale was aware on a daily basis of the "bad death" Fisher and Crosby's own expert testified would come as Dale got sicker and closer to the mesothelioma killing him.

The trial court also granted a new trial *nisi additur* for Brenda. The court found she had "turned into Mr. Jolly's caregiver" and that their already fifty-year marriage would be "cut short by at least ten years." The Jollys' daughter testified about how Dale's cancer scared Brenda and that it led her to neglect her own health. Brenda also had her life derailed by Dale's cancer as she testified that their calendar was filled with trips to see various doctors, and they could no longer do the things they once enjoyed.

---

[3] The jury, of course, was free to disregard any evidence it did not find credible. But on this point, we are concerned with the trial court's exercise of discretion in finding the verdict inadequate. In making that finding, the trial court must weigh the evidence and, therefore, its own view of the credibility of a witness becomes our focus in evaluating whether the decision was within the trial court's discretion.

All of this discussion comes not merely from our analysis of the record, but from the trial court's explanation of the reasons it found the verdicts inadequate. The trial court's explanation clearly supports its determination that this is one of those rare cases in which "compelling reasons" justify the conclusion the verdicts were inadequate, despite the "substantial deference" due to the jury's constitutional role. The trial court's decision finding the verdicts inadequate was, therefore, within its discretion.

## C

As mentioned above, neither the Jollys nor the petitioners Fisher and Crosby raised to the trial court, to the court of appeals, or to this Court the issue of whether the jury's verdict was grossly inadequate, which—as we explained—would foreclose a new trial *nisi*. Because we view this as a serious question in this case, however, we raise the issue ourselves. To increase Dale's verdict from $200,000 to $1,580,000— a multiplier of almost eight times the jury's verdict—is a significant increase. Even so, the two *nisi* amounts still fall $400,000 below the total of pretrial settlements. This means not that the trial court's increase ended at a point that is too high,[4] but that the increase started at a point that was quite low. Chief Justice Kittredge argues the amount of the verdict increase in this case "in no manner reflects a response to a 'merely inadequate' jury verdict," but rather demonstrates even the trial court's "view that the jury verdict was 'grossly inadequate.'" Chief Justice Kittredge makes a strong argument on this point, but we respectfully disagree. We find the trial court's decision to grant a new trial *nisi* on the basis that the verdicts were inadequate—but not grossly so—was within the court's discretion.

Addressing our statement in *Riley* and other cases that "the trial judge must distinguish between awards that are merely unduly liberal or conservative and awards that are actuated by passion, caprice, or prejudice," 414 S.C. at 192, 777 S.E.2d at 828, we see an interesting practical difference between a trial court granting a new trial *nisi additur* as opposed to a new trial *nisi remittitur*. In the latter case, the moving party—the defendant—is almost certain to argue in the first instance the verdict is grossly excessive, warranting a new trial absolute, and only secondarily argue the verdict is merely excessive. Thus, the question whether the verdict is merely excessive or grossly excessive will almost always be squarely presented to the trial court in the case of a motion for a new trial *nisi remittitur*.

---

[4] Fisher and Crosby do not specifically challenge the $1,580,000 figure as too high.

In the case of a motion for a new trial *nisi additur*, however, it is unlikely the moving party—the plaintiff—will argue for a new trial absolute and thereby sacrifice his verdict on the question of liability.[5]  Likewise, it is almost inconceivable the defendant will argue the jury's verdict is "grossly inadequate."  Thus, in a typical *nisi additur* situation, the parties will almost never press the trial court to "distinguish between awards that are merely unduly . . . conservative and awards that are actuated by passion, caprice, or prejudice" as we required in *Riley*, relying on *Durham*, both of which involved an inadequate jury verdict.  *Riley*, 414 S.C. at 192, 777 S.E.2d at 828; *Durham*, 314 S.C. at 530, 431 S.E.2d at 558.  As we explained, that is the situation here: no party asked the trial court to determine if the verdicts were grossly inadequate.  Nevertheless, the law requires the trial court must make the determination.  If the trial court believes the damages awarded by the jury are grossly inadequate, but no party asked for a new trial absolute, the court must deny the motion for a new trial *nisi*, thereby leaving the original verdict intact.  In a typical *nisi additur* situation, therefore, the plaintiff who does not also ask for a new trial absolute runs the risk he will be stuck with the original jury verdict if the trial court finds the verdict grossly inadequate.  *But see Folkens v. Hunt*, 300 S.C. 251, 254, 387 S.E.2d 265, 267 (1990) ("The thirteenth juror doctrine is a vehicle by which the trial court may grant a new trial absolute when [s]he finds that the evidence does not justify the verdict.").

## D

Because we affirm the trial court's order granting a new trial *nisi additur*, we clarify that Fisher or Crosby may elect a new trial as to all issues on remand from our decision.  Some of our opinions in previous cases state that when a party "appeals from an order granting a new trial *nisi* . . . , the order is viewed, on appeal, as one granting a new trial absolute."  *Daniel v. Sharpe Construction Co.*, 270 S.C. 687, 691, 244 S.E.2d 312, 314 (1978) (citing *Strickland v. Prince*, 247 S.C. 497, 499, 148 S.E.2d 161, 162 (1966); *Collins v. Johnson*, 245 S.C. 215, 225, 139 S.E.2d 915, 920 (1965)).  Those opinions suggest that the filing of an appeal acts as a rejection of the

---

[5] We are aware of one case in which the plaintiff made a motion for a new trial absolute on the grounds of a "completely and wholly inadequate" verdict: *Toole v. Toole*, 260 S.C. 235, 240, 195 S.E.2d 389, 391 (1973).  The trial court denied the motion and this Court reversed and ordered a new trial.  260 S.C. at 242, 195 S.E.2d at 392.

new trial option. *Id.* In contrast, our opinions in recent cases have allowed the non-movant—on remand—to accept the increased or reduced verdict or opt for a new trial. *E.g.*, *Graham*, 282 S.C. at 402, 321 S.E.2d at 45-46; *Riley*, 414 S.C. at 198, 777 S.E.2d at 831.[6] We hold the recent opinions are correct. Any party aggrieved by an order granting a new trial *nisi* may choose to accept the increased or reduced amount—the *nisi* amount—without filing an appeal, or if the party does appeal and the appellate court affirms, the party may elect a new trial on remand from that decision. To the extent the following cases are inconsistent with our ruling today, they are overruled: *Daniel v. Sharpe Construction Co.*, 270 S.C. 687, 244 S.E.2d 312 (1978); *Strickland v. Prince*, 247 S.C. 497, 148 S.E.2d 161 (1966); *Collins v. Johnson*, 245 S.C. 215, 139 S.E.2d 915 (1965).

## III

After trial, Fisher and Crosby requested the trial court set off the full amount of all pretrial settlement proceeds against the jury verdicts—in either their original or *nisi* amounts—pursuant to section 15-38-50 of the South Carolina Code (2005).[7] The

---

[6] *See also Hall v. Nw. R.R. Co. of S.C.*, 81 S.C. 522, 532-34, 62 S.E. 848, 852-53 (1908) (reversing trial court order conditioning new trial *nisi* on forgoing appeal and ordering that on remand plaintiff shall have the option of remittitur or a new trial).

[7] Section 15-38-50 provides:

> When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death:
>
> (1) it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide, but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater . . . .

S.C. Code Ann. § 15-38-50.

trial court reviewed the settlements and confirmed the Jollys received $2,270,000 from other defendants. The Jollys informed the trial court they "internally allocated" those proceeds one-third to Dale's personal injury claim, one-third to Brenda's loss of consortium claim, and one-third to the potential wrongful death claim that would arise if and when Dale died of his mesothelioma. The trial court found the Jollys' allocation was "reasonable," and based on that allocation denied Fisher and Crosby's request to set off the full amount of all settlements. The trial court then set off one-third of the settlements ($756,666.67) against Dale's *nisi* amount, leaving a balance due of $823,333.33, and set off one-third of the settlements against Brenda's *nisi* amount, leaving no balance due. The court of appeals affirmed. *Jolly*, 435 S.C. at 664, 869 S.E.2d at 850.

The concept of setoff is that a "non-settling defendant is entitled to credit for the amount paid by another defendant who settles for the same cause of action." *Riley*, 414 S.C. at 195, 777 S.E.2d at 830 (2015) (quoting *Rutland v. S.C. Dep't of Transp.*, 400 S.C. 209, 216, 734 S.E.2d 142, 145 (2012)). This "setoff" credit "arises by operation of law." *Smith v. Widener*, 397 S.C. 468, 472, 724 S.E.2d 188, 190 (Ct. App. 2012). Therefore, "the [trial] court must reduce the amount of the verdict to account for any funds previously paid by a settling defendant, so long as the settlement funds were paid to compensate the same plaintiff on a claim for the same injury." *Id.* (citing *Hawkins v. Pathology Assocs. of Greenville, P.A.*, 330 S.C. 92, 113, 498 S.E.2d 395, 406-07 (Ct. App. 1998)). The purpose of setoff is to "prevent[] an injured person from obtaining a double recovery for the damage he sustained, for it is almost universally held that there can be only one satisfaction for an injury or wrong." *Rutland*, 400 S.C. at 216, 734 S.E.2d at 145 (internal quotation marks omitted).

The General Assembly began section 15-38-50 with the predicate, "When a release or a covenant not to sue . . . is given in good faith to one of two or more persons liable in tort *for the same injury* or *the same wrongful death* . . . ." § 15-38-50 (emphasis added). By its terms, therefore, the statute applies when the pretrial settlement and the jury verdict arise from the same claim. In that circumstance—as was also true under the common law[8]—there must be a setoff. However, to the

---

[8] Section 15-38-50 was enacted in 1988. Act No. 432, 1988 S.C. Acts 2891, 2899. Before then, however, the same principle applied from the common law requiring a setoff of pretrial settlement funds against a jury verdict when they both arise from the same claim or injury. *See Powers v. Temple*, 250 S.C. 149, 155, 156 S.E.2d 759,

extent the claims are not the same, both the original theory of setoff and the quoted text of section 15-38-50 do not permit setoff. The difficult question to be answered in ruling on a setoff motion is the extent to which the claims are the same.

Fisher and Crosby make three specific arguments that the trial court erred by denying their motion for a full setoff. First, they argue "courts cannot give effect to a unilateral or 'internal' allocation of settlement proceeds for purposes of setoff." We agree that trial courts cannot blindly accept a party's allocation of settlement funds for purposes of setoff. That is true whether the allocation was unilateral—as here— or bilateral in an approved pretrial settlement agreement—as in *Rutland*. As we will explain, the key principle is that *the setoff judge* has the responsibility to make a reasonable allocation of settlement funds as a predicate to a setoff ruling. This key principle arose under common-law setoff, and it remains "key" under the terms of section 15-38-50.

A "reasonable allocation" is one that fairly approximates the value the settling defendants paid in exchange for a release of each of the several claims. To illustrate this point, we turn back to *Rutland*. In that case, the plaintiff's wife died "instantaneously" in an automobile accident. 400 S.C. at 217, 734 S.E.2d at 146. Accordingly, there was "no evidence of conscious pain or suffering." 400 S.C. at 214, 734 S.E.2d at 144. Nevertheless, the plaintiff and two settling defendants agreed to allocate almost half of $305,000 in settlement funds "to conscious pain and suffering under the potential . . . survival claim" and the remainder to the wrongful death claim. 400 S.C. at 212, 734 S.E.2d at 143. A circuit judge approved the settlement. *Id.* The plaintiff proceeded to trial against the only remaining defendant—the South Carolina Department of Transportation (SCDOT)—on a claim of wrongful death; no survival claim. 400 S.C. at 213, 734 S.E.2d at 143. The jury returned a verdict of $300,000. *Id.* SCDOT then argued it was entitled to setoff in the entire amount of the pretrial settlements. *Id.* The trial court agreed, finding "there is not sufficient evidence from which a jury could have concluded [the wife] experienced conscious pain and suffering of any kind before, during, or after the accident." *Id.*

---

761 (1967) (stating "the rule is almost universally followed that one tort feasor is entitled to credit for the amount paid by another tort feasor for a covenant not to sue"); *Ward v. Epting*, 290 S.C. 547, 560, 351 S.E.2d 867, 875 (Ct. App. 1986) ("A nonsettling defendant is entitled to a [corresponding] reduction of a judgment in the same cause of action." (citing *Temple*, 250 S.C. at 155, 156 S.E.2d at 761)).

The *Rutland* trial court (now-Justice James) determined essentially that—because there was no evidence of conscious pain or suffering—the settling defendants did not pay any funds to settle a survival claim, but paid only to settle the wrongful death claim. Justice James then did exactly what the General Assembly required in subsection 15-38-50(1). He compared the "amount stipulated by the release or the covenant" to "the amount of the consideration paid for [the release or the covenant]," and chose as the setoff figure "whichever is the greater" amount.[9] Therefore, SCDOT—whose verdict against it was exclusively for wrongful death—was entitled to a setoff of the entire settlement amount. In holding "the trial court acted within its discretion by reallocating the settlement funds," 400 S.C. at 216, 734 S.E.2d at 145, and thus affirming Justice James, this Court recognized that despite the pretrial settlement agreement purporting to allocate funds between the several claims, and despite the approval of that agreement by another circuit judge, it remained the responsibility of the setoff judge to make a reasonable allocation that fairly approximated the value the settling defendants actually paid to settle the wrongful death claim.

The *Rutland* scenario brings up another important point. When the pretrial settlement in that case was presented to the settlement judge for approval, the "stipulated amount" allocated to the wrongful death claim came from an agreement between the plaintiff and one of the settling defendants. 400 S.C. at 212, 734 S.E.2d at 143. SCDOT's right to setoff did not arise until after the jury verdict. Because SCDOT was not a party to the settlement agreement and its right of setoff had not yet arisen, SCDOT technically had no right to be heard on the propriety of the allocation set forth in the settlement agreement. To protect SCDOT's rights, therefore, it was necessary that the setoff judge hear SCDOT's arguments on what should be the final allocation. That hearing may take place only after the jury verdict because until then there is no issue to resolve. Thus, while the setoff judge must consider such an agreed-upon allocation, the ultimate "reasonable allocation" can be determined only after the setoff judge has heard the arguments of the non-settling defendant following the jury verdict. Otherwise, the setoff rights of the non-settling

---

[9] In *Rutland*, the two possible amounts for setoff as to the wrongful death verdict were (1) an "amount stipulated" of $167,000 and (2) the "consideration paid" as determined by the setoff judge of $305,000. 400 S.C. at 212-13, 734 S.E.2d at 143-44.

defendant will have been litigated without giving that party an opportunity to be heard.

Therefore, if there is an agreement between the settling parties allocating settlement funds, or a ruling by a judge approving such a settlement, or even—as here—a unilateral, internal allocation by the plaintiff, the setoff judge may accept that allocation only if the judge determines it is reasonable. Here, the Jollys "informed" the trial court of their internal allocation, which was in reality simply the Jollys' proposal as to how the trial court should make the allocation, and the trial court (the "setoff judge") expressly found the proposed allocation was reasonable. In other words, the trial court in this case determined that the proposed allocation "fairly approximated the value the settling defendants paid to settle" each of the three claims. We hold the trial court acted within its discretion.

Second, Fisher and Crosby argue that under section 15-38-50, when a pretrial settlement agreement has no "amount stipulated"—as here—the entire settlement amount must be set off against the jury verdict. Chief Justice Kittredge adopts this interpretation in his dissent. We disagree. Such an interpretation of section 15-38-50 disregards the predicate language we discussed above, which provides that setoff is based on payments "for the same injury or the same wrongful death." § 15-38-50. Thus, section 15-38-50 does not permit setoff unless the setoff judge either (1) finds the "amount stipulated" in the settlement agreement is a reasonable allocation of settlement funds between the claims, or (2) otherwise determines "the amount of consideration paid" for the release of that claim. *See Smith*, 397 S.C. at 472, 724 S.E.2d at 190 (requiring setoff "so long as the settlement funds were paid to compensate the same plaintiff on a claim for the same injury"); *Hawkins*, 330 S.C. at 113, 498 S.E.2d at 407 ("[T]he reduction in the judgment must be from a settlement for the same cause of action." (citing *Ward v. Epting*, 290 S.C. 547, 560, 351 S.E.2d 867, 875 (Ct. App. 1986))); *Rutland*, 400 S.C. at 217, 734 S.E.2d at 146 (affirming the trial court's reallocation of pretrial settlement proceeds).

The purpose of setoff is to prevent "double recovery," and thus setoff can apply only to the same injury or the same wrongful death because there is no double recovery where the pretrial settlement and the jury verdict arise out of different claims for different injuries. Here, there is no dispute there were at least two claims for different injuries. Fisher and Crosby concede they are not entitled to a setoff against Dale's verdict with Brenda's settlement, or vice versa, because those clearly are not "the same injury." *See Graham*, 282 S.C. at 397, 321 S.E.2d at 43 ("It is well settled

in South Carolina that one spouse's cause of action for medical expenses and loss of consortium resulting from negligent injuries to the other spouse is a different and distinct cause of action from one maintained by the injured spouse . . . ."). In the same way, they are not entitled to a setoff against Dale's personal injury verdict with his wrongful death settlement because those are obviously not "the same injury or the same wrongful death." § 15-38-50; *see also Bennett v. Spartanburg Ry., Gas & Elec. Co.*, 97 S.C. 27, 30, 81 S.E. 189, 190 (1914) (explaining that a survival action is distinct from a wrongful death claim in part because "the elements of damage recoverable are entirely different").

Third, Fisher and Crosby argue that no allocation of pretrial settlement proceeds to a wrongful death claim is appropriate because Dale was still alive when the settlements occurred. They rely on *Price v. Richmond & Danville Railroad Co.*, 33 S.C. 556, 12 S.E. 413 (1890), and *Reed v. Northeastern Railroad Co.*, 37 S.C. 42, 16 S.E. 289 (1892), and argue those cases hold that where a plaintiff settles his personal injury claim while living, and he ultimately dies of his injuries, "his estate [is] barred from recovering on its wrongful death claim." We do not doubt Fisher and Crosby are correct as to the holdings of *Price* and *Reed*. The question before us on this point, however, is not whether Dale sacrificed his beneficiaries' wrongful death claim by settling his personal injury claim. The question is whether—at the time the parties were negotiating the settlement—there was a potential wrongful death claim for which the settling defendants reasonably sought to obtain—and thus had good reason to pay for—a release.

This takes us back to the setoff judge's responsibility to fairly approximate the value the settling defendants paid to settle the several claims. It is standard practice—and certainly reasonable—for a settling defendant to ensure that *all* potential claims are released. At the time the Jollys were negotiating the pretrial settlements, there still remained the possibility that Dale would not live until trial. In that event, Brenda—or some other personal representative of Dale's estate—would certainly seek to amend the complaint to assert a wrongful death claim. It made perfect sense, therefore, for the settling defendants to pay Dale settlement funds in exchange for his release of his estate's wrongful death claim. We hold the trial court acted within its discretion in this unique case by denying setoff for what the settling defendants paid to settle the potential wrongful death claim because it is not for the same injury as Dale's personal injury claim.

We are concerned, however, that allocating pretrial settlement proceeds to a then-nonexistent claim to limit setoff poses the potential for abuse. In this unique case, Dale was medically certain to die from mesothelioma if something else did not kill him first. In this case, therefore, we have no concerns about abuse. In other cases, there may be a moderate or even minimal chance that eventually an injured plaintiff will die as a proximate result of some tortious injury. To permit a settling plaintiff to allocate settlement funds to a far-fetched potential wrongful death claim would certainly violate the provisions of section 15-38-50. Thus, in future cases, if parties wish to allocate settlement funds to potential wrongful death claims, the funds for that portion of the settlement—minus a reasonable portion of attorney's fees and costs—must be set aside for the benefit of the eventual wrongful death beneficiaries. Whether this must be accomplished by creating an irrevocable trust or otherwise we leave to those who wish to make such an allocation, but the important point is the funds may not be paid to or otherwise made available to the still-surviving plaintiff.

## IV

We conclude the trial court acted within its discretion in granting *additur* and allocating setoff. We affirm the court of appeals and remand for Fisher and Crosby to accept the *additur* or opt for a new trial.

**AFFIRMED.**

**JAMES, HILL, JJ., and Acting Justice Donald W. Beatty, concur. KITTREDGE, C.J., concurring in part and dissenting in part in a separate opinion.**

**CHIEF JUSTICE KITTREDGE:** I concur in part and dissent in part. I concur insofar as affirming the grant of a new trial *nisi additur* to Respondent Brenda Jolly for her loss of consortium claim. Otherwise, I respectfully dissent.

## I.

### *Nisi Additur*

Our law permits a trial court to grant a new trial *nisi* when the jury's verdict is "merely" excessive or inadequate. *See Riley v. Ford Motor Co.*, 414 S.C. 185, 192, 777 S.E.2d 824, 828 (2015). A new trial *nisi* is not an option when the jury's verdict is "*grossly* excessive or inadequate." *Id.* (emphasis added). Further, although a trial court should only invade the province of the jury for "compelling reasons," a trial court's determination in new trial motions is controlled by an abuse of discretion standard. *Id.* at 192–93, 777 S.E.2d at 828–29. When we say that a trial court's determination in new trial motions is controlled by an abuse of discretion standard, the "compelling reasons" standard places constraints on the exercise of that discretion. Here, Respondents Dale and Brenda Jolly moved for only a new trial *nisi additur*, not a new trial absolute. Yet, in their motion, the Jollys requested an *additur* far in excess of the jury verdicts. A fair reading of their motion for a new trial *nisi additur* indisputably indicates the Jollys' view that the jury award for each plaintiff was grossly inadequate rather than merely inadequate.

Concerning Brenda's loss of consortium claim, the jury awarded Brenda $100,000. The trial court granted Brenda a new trial *nisi additur* and increased the award to $290,000. I join the majority in finding no abuse of discretion with respect to the new trial *nisi additur* in Brenda's case, for the increase of her award reflects a response to a merely inadequate jury award.

However, I depart from the majority in regard to Dale's claim. As to his personal injury claim, the jury awarded $200,000 in damages. In his motion for a new trial *nisi*, he sought a substantial *additur*, well in excess of $1,000,000, for both economic and noneconomic damages. Specifically, Dale asserted "that the total cost of [his] past and future medical care, from the time of his diagnosis to the time of his death, would reasonably be $1,000,000 or more." Dale similarly contended "noneconomic damages should be at least $1,000,000." The trial court granted the motion and increased Dale's verdict $1,580,000. As conceded by the majority, the resulting *additur* "is a significant increase." In fact, it represents an increase far beyond any *additur* this Court has upheld. Consistent with our precedents, such an increase here

in no manner reflects a response to a "merely inadequate" jury verdict. Rather, in my judgment, the *additur* reflects a view that the jury verdict was "grossly inadequate," rendering the trial court's decision to grant of a new trial *nisi additur* an abuse of discretion. Accordingly, I would reverse the grant of a new trial *nisi additur* as to Dale's claim.[10]

## II.

## Setoff

South Carolina law has long recognized that a "non-settling defendant is entitled to credit for the amount paid by another defendant who settles for the same cause of action." *Rutland v. S.C. Dep't of Transp.*, 400 S.C. 209, 216, 734 S.E.2d 142, 145 (2012) (citation omitted). It is widely accepted there can only be one satisfaction for an injury or wrong. *Id.* (citation omitted). This common law rule was codified as part of the South Carolina Contribution Among Tortfeasors Act (the Act). Specifically, section 15-38-50 provides the framework for allocating settlement proceeds against a subsequent damages verdict:

> When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death:
>
> > (1) it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide, but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the

---

[10] I fully appreciate the evidence in the record detailing the progressive and horrific nature of mesothelioma. The majority opinion provides graphic descriptions of the disease progression and its effects on Dale and, indeed, on Brenda and the rest of the family. This tragic reality, however, only confirms that if liability were established, a verdict of $200,000 was grossly inadequate. Similarly, I recognize the practical considerations of why a party would seek a *nisi additur* (merely inadequate) as opposed to a new trial absolute (grossly inadequate). The majority addresses this in detail. Nevertheless, while sympathetic to the Jollys' plight, I am not aware of any basis in law that would permit a court to exchange settled law concerning a new trial *nisi* for the court's preferred outcome.

consideration paid for it, whichever is the greater; and

(2) it discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor.

S.C. Code Ann. § 15-38-50 (2005).

Prior to the underlying trial, the Jollys settled claims against other allegedly at-fault parties. The consideration for the settlement of those claims was $2,270,000. At the time, the settling parties (including the Jollys) did not allocate the settlement funds. After the jury returned verdicts for both Dale and Brenda, Petitioners (non-settling defendants) requested the trial court set off the full amount of the pretrial settlement proceeds against the jury verdicts. To ensure there was no double recovery for Dale and Brenda, the trial court inquired as to the allocation of the pretrial settlement proceeds. The Jollys admitted there was no allocation at the time of the settlement and, instead, informed the trial court that they "internally allocated" the settlement proceeds: one-third to Dale's personal injury claim, one-third to Brenda's loss of consortium claim, and one-third to a potential wrongful death claim.

Section 15-38-50 does not, in my judgment, permit the interpretation advanced by the Jollys and adopted by the Court majority today. For setoff purposes, pursuant to the plain language of the statute, I reject the view of a secret, "internal" allocation completed only after the jury renders a verdict in the trial against any non-settling defendants. Section 15-38-50 manifestly requires settling parties to allocate settlements proceeds at the time of the settlement. Specifically, the statute provides that when a release is "given in good faith . . . for the same injury or the same wrongful death[,]" a settlement for the same injury "reduces the claim against the others to the extent of any amount stipulated by the release . . . or in the amount of the consideration paid for it, whichever is the greater." Therefore, for a settlement to have effect for allocation purposes, the "amount [must be] *stipulated by the release*." (Emphasis added). No construction of the plain language of this statute permits a plaintiff to take a wait-and-see approach to allocating settlement proceeds.

The trial court found the Jollys' after-the-fact, "internal" allocation was proper. I disagree and would reverse. Specifically, I would enforce the statute as written. Because the allocation was not "stipulated by the release[,]" I would order that the full amount of the pretrial settlement proceeds be set off against the jury verdicts. Accordingly, I dissent.

I offer two concluding points.  First, it is well recognized that a plaintiff will allocate settlement proceeds in a manner advantageous to himself or herself, and not the remaining, non-settling defendants.  My dissenting opinion should not be construed as opposing this practice.  This principle was discussed in *Riley v. Ford Motor Co.*, an opinion I authored in 2015.  414 S.C. at 196–97, 777 S.E.2d at 831.  Referencing this widely accepted practice, and citing caselaw from another jurisdiction, we stated, "A plaintiff who enters into a settlement with a defendant gains a position of control and acquires leverage in relation to a non[-]settling defendant."  *Id.* at 197, 777 S.E.2d at 831 (citations omitted).

In *Riley*, following a motor vehicle accident involving Benjamin Riley and Andrew Marshall Carter II, Riley's estate sued both Carter and the Ford Motor Company.  Riley alleged that Carter had failed to yield the right-of-way.  Before trial, Riley settled with Carter for $25,000 and allocated the settlement proceeds between survival and wrongful death claims.  The allocation was stipulated in the release.  The settlement was approved by the court in April 2010, and in September 2011, the case against Ford proceeded to trial.  *Riley* illustrates the proper procedure for allocating settlement proceeds under section 15-38-50.  To be sure, a plaintiff will naturally desire to apportion a settlement to his advantage, and the law does not frown upon it.  That is a far cry from waiting to see what the verdict is before creating an allocation.

My final comment is a recognition that section 15-38-50 is not a model of clarity, especially the "whichever is the greater" language.  Even where the parties honor the statute's requirement that the allocation be "stipulated by the release[,]" and assuming the allocation is deemed reasonable, the "whichever is the greater" language could lead to absurd results.  However, that is not the situation here.  The statute as written may not always produce equitable results in line with the purposes of the Act, but the statute compels that the allocation be determined at the time of the settlement and that it be "stipulated by the release."  When the allocation of settlement proceeds is determined and set forth up front—and assuming the allocation is found to be reasonable—I will adhere to the statute and honor the settlement agreement allocation, just as I did in similar circumstances in *Smith v. Tiffany*, 419 S.C. 548, 799 S.E.2d 479 (2017).

In *Smith*, we were required to interpret another statute in the Act.  We acknowledged that the Act was intended to fairly apportion damages in line with joint tortfeasors' degrees of fault.  Specifically, the Act was designed "to protect non[-]settling defendants" so that an at-fault party's liability would be limited to his or her pro rata

share of fault. However, competing language in section 15-38-15[11] appeared at odds with this policy goal. The parties in *Smith* nevertheless conceded the statutory language was unambiguous.

We were thus left to apply the plain meaning rule to statutory terms such as "defendant" and "potential tortfeasor, whether or not a party." These terms are clearly understood, and we applied the Act as written. Yet we acknowledged in *Smith* that our result—although faithful to what the parties conceded was unambiguous statutory language—might have been contrary to the Act's goal of apportioning liability in accordance with the degree of fault. Simply stated, we enforced the statute as written. *Id.* at 559, 799 S.E.2d at 485 ("The most prominent obstacle to Appellants' approach is separation of powers, for we must defer to the will of the legislature as expressed in the Act. If the policy balance struck by the legislature in Act is to be changed, that prerogative lies exclusively within the province of the Legislative Branch."). I authored the majority opinion in *Smith*, and I continue to believe that decision honored the the rules of statutory construction in interpreting unambiguous statutory language. The legislature remains free to amend the Act.

While unambiguous statutory language was enforced in *Smith*, I believe the Court's result today is directly contrary to the unambiguous requirement in section 15-38-50 that the allocation of settlement proceeds be "stipulated by the release."

## III.

I concur with the majority in upholding the grant of a new trial *nisi additur* to Respondent Brenda Jolly for her loss of consortium claim. I otherwise dissent. I would reverse the grant of a new trial *nisi additur* to Respondent Dale Jolly for his personal injury claim. In accordance with the clear language in section 15-38-50, I would reverse and order that the full amount of the pretrial settlement proceeds be set off against the jury verdicts.

---

[11] S.C. Code Ann. § 15-38-15 (Supp. 2023).