16752

BRABHAM v. SOUTHERN ASPHALT HAULERS, INC. *ET AL.*

(76 S. E. (2d) 301)

*Messrs. Hope, Willcox & Cabaniss,* of Charleston, *for Appellant,*

*Messrs. Legare & Hare,* and *G. M. Howe, Jr.,* all of Charleston, *for Respondent,*

June 9, 1953.

TAYLOR, Justice.

This appeal arises out of an action brought in the Court of Common Pleas for Charleston County for injuries alleged to have been sustained by the plaintiff when the panel truck in which she was riding was alleged to have been forced from the highway into a concrete bridge in Williamsburg County, South Carolina, April 8, 1951.

Southern Asphalt Haulers, Inc., served first, duly answered, setting forth a general denial and further alleged that the tractor and trailer involved was at that time operated by Infinger Transportation Company, Inc., under a lease agreement and was therefore under the direction and control of the said Infinger Transportation Company, Inc., its agent and servant, the driver. Thereafter, plaintiff successfully moved for an order making Infinger Transportation Company, Inc., a party defendant and for permission to

amend her complaint accordingly. Both parties were thereafter served with the amended complaint and both defendants filed answers denying the material allegations of the complaint and setting forth defenses of contributory negligence and contributory willfulness and each denied that the driver of the tractor and trailer was its agent and servant at the time of the collision.

The case came on for trial before the Honorable James B. Pruitt and a jury in Charleston County in March, 1952, which resulted in a verdict for $12,500.00 actual damages against the appellant, Infinger Transportation Company, Inc., alone, who seasonably moved for a new trial upon the minutes and judgment *non obstante veredicto;* such motions were denied by the presiding Judge in an order filed May 21, 1952, and from this order Infinger Transportation Company, Inc., appeals upon exceptions which present two questions:

"1. Could it be reasonably inferred from all the evidence that the driver of the defendant tractor was an agent or servant or under the control of the Infinger Transportation Company?

"2. Was the verdict for $12,500.00 actual damages, excessive in view of the injuries to the plaintiff properly attributable to the accident?"

The record discloses that the appellant had previously successfully bid for and been awarded a contract to transport asphalt for the ESSO Standard Oil Company from Charleston, South Carolina, to Durham, North Carolina; that appellant did not have sufficient equipment to transport these asphalt products and entered into a lease agreement with the Southern Asphalt Haulers, Inc., whereby equipment of the latter was to be used in the transportation of these products under the I. C. C. rights held by Infinger Transportation Company, Inc. Under this lease, the drivers furnished with the equipment, would be under the complete direction, control and supervision of the appellant while so

operating and appellant would pay all drivers wages, social security taxes, workmen's compensation, etc.; all drivers logs and delivery tickets would be mailed to appellant daily; all billing and collecting for the operation of the equipment was to be done by appellant at the end of each week who would then remit to Southern Asphalt Haulers, Inc., such amounts as were due it at the rate published in the appellant's motor freight tariff, less the driver's wages and other amounts to be paid by appellant and two per cent for bookkeeping services. The Southern Asphalt Haulers, Inc., paid for all gasoline, oil, tires, repairs, license tax, upkeep and maintenance of the leased equipment. When such equipment was operated under the lease agreement, placards were displayed to the following effect: "Leased by Infinger Transportation Company, Inc., I. C. C. No. MF-109-8 91." The lease agreement also carried therein the number of tractors and trailers together with the names of the drivers, but Mrs. Infinger, President of the appellant, testified that this proved impractical, that at times this equipment would be in need of repair and out of operation; therefore, this portion of the master lease had not been complied with for some time and on this occasion she was not aware of just who the drivers were but that she had the right of control over such drivers and equipment as this was a requirement when she operated under her I. C. C. rights. Two trucks had made the trip on this date to Durham and the drivers testified that such trips were made in behalf of the appellant and that placards, heretofore described, showing such information were prominently displayed and both testified that they knew and were aware that they were subject to and acting under the direction and control of the Infinger Transportation Company, Inc., at the time. The shipping orders and delivery tickets which were received into the evidence support this and the testimony of other witnesses to this effect.

In *Brownlee v. Charleston Motor Express Co.,* 189 S. C. 204, 200 S. E. 819, 824, this Court stated:

"* * * It is well settled that one who is the general

servant of another may be loaned or hired by his master to another for some special service so as to become, as to that service, the servant of such third person, the test being whether, in the particular service which he is engaged to perform, he continues liable to the direction and control of his master or becomes subject to that of the person to whom he is loaned or hired. *. * *' 18 R. C. L. 493, Section 3.

" '* * * In the case of an oral contract, if there is no material dispute in the testimony, whether the employee is an independent contractor may present a question for the Court; but, where the evidence is conflicting, or where different inferences may be drawn from the testimony concerning the oral contract, the matter is one for the jury to determine.' 14 R. C. L. 79, Section 16." See also *American Fidelity and Casualty Co. of Richmond, Virginia v. Zurich General Accident and Liability Ins. Co.,* D. C., 70 F. Supp. 613; *Standard Oil Company v. Anderson,* 212 U. S. 215, 29 S. Ct. 252, 53 L. Ed. 480.

Mrs. Mabel Infinger, President of the appellant, Infinger Transportation Co., Inc., was called as a witness for the plaintiff and she testified in part as follows:

"Q. On April 6th, 1951, your company had leased from the Southern Asphalt Haulers, Incorporated, a trailmobile trailer and a White tractor truck, which bore South Carolina License No. 93161, in order to haul certain asphalt products to Durham, North Carolina; that's correct, is it not? A. That's right.

"Q. And the agreement or lease which you had with the Southern Asphalt Haulers Company, Incorporated, for this leased equipment, did it involve the trip to Durham and return? A. That's correct.

"Q. And the return trip from Durham was upon the business and under the control of the Infinger Transportation Company? A. That's right."
and on cross-examination, she testified as follows:

"Q. Now, your company had Interstate Commerce Com-

mission authority to operate between South Carolina and North Carolina? A. That's right.

"Q. And Southern Asphalt Haulers, of course, did not. That's correct, is it not? They had authority to operate only in the State of South Carolina. A. That's right.

"Q. And when they operated under this lease arrangement between you, they had to carry signs or placards, or something else, showing that the equipment was leased to Infinger Transportation Company, Incorporated, with your Interstate Commission certificate No. M. C., whatever it was, or M. F., I think it was. A. That's right.

"Q. And under the Interstate Commerce regulations, you had to be in full control of that movement and of that driver; wasn't that correct? This fully complied with the Interstate Commerce regulations. A. That's right.

"Q. So that, when the trip went from South Carolina to North Carolina, it had to be your trip, didn't it? A. That's right.

"Q. And this particular trip was handled in accordance with the terms and agreements that I have mentioned to you. A. That's right.

"Q. You received the drivers' log, upon his return, and the delivery ticket, and you ran the transaction through your company's books, did the billing, did the collecting, and deducted what was coming to you for your part of the matter, and then remitted to the Southern Asphalt Haulers what was due it for the rental of its equipment, under the agreement; that's correct, isn't it? A. That's right.

"Q. Now, in going to Durham, North Carolina, from Charleston, the proper routing would be U. S. Highway 52, from here, up through Williamsburg County, on through Florence, etc.? A. That's right.

"Q. And that would also be the proper way of return? A. That's right.

"Q. And this particular transaction started here on April 6th, I believe? A. That's when it was moved out, April 6th.

"Q. Moved out on the night of April 6th, I believe, got there the 7th, and was returning on April 8th, down from U. S. Highway 52. A. That's right."

and again on cross-examination, she testified as follows:

"Q. And you reserved the same complete control, direction and supervision over all of the drivers as you did over any that you actually had put on your payroll at the beginning. A. That's right.

"Q. And you had to do that under the federal regulations. A. Well, I suppose so.

"Q. You were the certificated carrier from the Interstate Commerce Commission, and you complied with the federal regulations in that respect, didn't you? A. That's right.

"Q. You assumed the responsibility for the trip, the direction of the drivers, you had the right to control them, didn't you? A. That's right.

"Q. And you had to have it? A. I had to.

"Q. So that whenever the Southern Asphalt put a truck— when your office relayed a Standard Oil communication that came to you from them, and you wanted equipment, it was leased to you, and you put it into operation under your understanding with them, whether it was that master letter, or your oral agreement, or any other, and it all went the same way. The status of the drivers and the trucks were always the same, whether they were mentioned in the letter or not, and sometimes you needed more drivers than you had on your payroll, isn't that right? A. That's the way I always considered it.

"Q. And the drivers came under your control when they were used at your request, isn't that correct? A. That's right."

When the foregoing is considered in the light of the principle set forth in the *Brownlee case, supra,* it is clear that there was sufficient evidence from which the jury could conclude that the appellant as lessee of the tractor and trailer assumed direction and control of

such vehicle in its operation and in doing so assumed responsibility for the proper operation thereof. It is true that the drivers thereof would be kept upon the payroll of the Southern Asphalt Haulers, Inc., but provision was made for the deduction of wages, social security taxes, etc., without such drivers actually appearing on the payroll of the appellant; but this in nowise renders a nullity the fact that appellant assumed complete control and direction of the operation of such equipment and its operators while operating, in interstate Commerce under its I. C. C. rights and it will not be permitted to escape liability to the public for the negligent operation of such equipment. *Shapiro v. City of Winston-Salem,* 212 N. C. 751, 194 S. E. 479; *Jocie Motor Lines, Inc., v. Johnson,* 231 N. C. 367, 57 S. E. (2d) 388; *Brown v. L. H. Bottoms Truck Lines, Inc.,* 227 N. C. 299, 42 S. E. (2d) 71; *Wood v. Miller,* 226 N. C. 567, 39 S. E. (2d) 608; *Hodges v. Johnson,* D. C., 52 F. Supp. 488; *Steffens v. Continental Freight Forwarders Co.,* 66 Ohio App. 534, 35 N. E. (2d) 734; *Kimble v. Wilson,* 352 Pa. 275, 42 A. (2d) 526; Restatement of the Law of Torts, Section 428.

In considering the second question, we find testimony to the effect that respondent suffered a badly sprained neck, from which she had not recovered at the time of the trial, broken rib, a serious blow to the region of the pelvis, resulting in intense pain, chest injuries, right wrist sprained, and her face was cut and bruised; that she was and continued to be for some time in a state of intense pain. Shortly after the collision, she was found to be suffering from an incomplete abortion and was administered drugs in an effort to complete the abortion. Later, she was admitted to the Baker Sanitorium and the abortion completed by surgery; that prior to these injuries she was a normal, healthy person but now suffers with menstrual complications so painful as to require her to be confined to her bed three or four days each month. There is testimony that her health has been impaired to such an extent as to become permanent.

Appellant contends that respondent suffered the loss of her father only a short while before the accident and that this mental shock could have well been the cause of her aborting, that there is no specific testimony in the record to the effect that such condition was brought about by the injuries sustained in the collision, and that the jury considered this element of damages in arriving at its verdict which is excessive. Dr. Wilson testified that it was "not uncommon for abortion to follow" such injuries as respondent suffered. This Court, of course, has no knowledge of what the verdict of the jury was predicated upon, but the other injuries heretofore referred to and all of the attendant circumstances were undoubtedly considered by the jury in arriving at its verdict. Further, there was no motion on the part of appellant to exclude this issue from the consideration of the jury or any request to charge the jury in respect thereto.

The question of whether or not the verdict is excessive must be considered in the light of the evidence and if there is substantial evidence to sustain the verdict, it will not be disturbed. The Court must respect the verdict of the jury in fact as well as in pretense or theory and must not interfere or substitute its own judgment for that of the jurors. One is entitled to the constitutional privilege of the fair judgment of a jury rather than that of the Court and this Court will not interfere with the verdict of a jury simply because it is greater than its own estimate; only where the verdict is so grossly excessive as to shock the conscience of the Court and clearly manifest that it was the result of caprice, passion, partiality, prejudice, corruption or other improper motives, will this Court intervene. *Haselden v. Atlantic Coast Line R. Co.,* 214 S. C. 410, 53 S. E. (2d) 60; *Jennings v. McCowan,* 215 S. C. 404, 55 S. E. (2d) 522; *Rogers v. Atlantic Coast Line R. Co.,* 222 S. C. 66, 71 S. E. (2d) 585; *Vernon v. Atlantic Coast Line R. Co.,* 221 S. C. 376, 70 S. E. (2d) 862.

For the foregoing reasons, we are of the opinion that all exceptions should be dismissed and the judgment appealed from affirmed and it is so ordered.

BAKER, C. J., and STUKES and OXNER, JJ., concur.

J. B. PRUIT, A. A. J., disqualified.