**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

Joseph P. Sellaro, Respondent,

v.

The South Carolina Department of Social Services and the Sheriff of Richland County in his official capacity, Defendants,

Of which the South Carolina Department of Social Services is the Appellant.

Appellate Case No. 2022-001218

Appeal From Richland County
Robert E. Hood, Circuit Court Judge

Unpublished Opinion No. 2025-UP-058
Heard December 2, 2024 – Filed February 19, 2025

**AFFIRMED**

Lake E. Summers, of Malone Thompson Summers & Ott, LLC, and Andrew F. Lindemann, of Lindemann Law Firm, P.A., both of Columbia, for Appellant.

Paige B. George, of Barry B. George, P.A., and Karl S. Brehmer, of Brown & Brehmer, both of Columbia, and

Kathleen C. Barnes, of Barnes Law Firm, LLC, of Hampton, all for Respondent.

---

**PER CURIAM:** In this action for negligence and false imprisonment, the South Carolina Department of Social Services (DSS) appeals the trial court's denial of its motions for a directed verdict and a judgment notwithstanding the verdict (JNOV). DSS claims that (1) probable cause existed that defeated both actions, (2) immunity under the South Carolina Tort Claims Act (SCTCA)[1] precluded liability, and (3) Respondent Joseph P. Sellaro failed to establish the standard of care owed by DSS and a breach of that standard. Additionally, DSS argues the trial court erred by denying it a new trial because (1) the issue of immunity under SCTCA was submitted to the jury rather than being decided by the court, (2) the award of $300,000 is unsupported by evidence, and (3) the award is grossly excessive or, at least, unduly liberal. We affirm.

## FACTS

Sellaro brought this action against DSS after he was taken into Emergency Protective Custody (EPC) by the Richland County Sheriff's Department (RCSD) and confined to a hospital for nine days. Sellaro claims DSS falsely imprisoned him and acted negligently by breaching the standard of care owed to him under the Omnibus Adult Protection Act (the Adult Protection Act).[2]

The impetus for Sellaro's confinement arose on Saturday, February 27, 2016, when Sellaro's wife of forty-one years, Eileen Sellaro, passed away in a car accident. The coroner's office alerted RCSD that Eileen's emergency contact, Carol Outlaw, claimed that Eileen was Sellaro's primary caregiver. RCSD sent officers to Sellaro's house to assess the possible need for EPC. Outlaw, who went with the coroner to Sellaro's house, told the responding deputies that Sellaro had diabetes and could not drive or take care of himself alone. A deputy testified that he was "very concerned" about Sellaro and that Sellaro appeared confused. Unsure about Sellaro's ability to test his blood sugar and administer insulin, RCSD placed him into EPC and called EMS to transport him to a local hospital.[3]

---

[1] S.C. Code Ann. §§ 15-78-10 to -220 (2005 & Supp. 2024).

[2] S.C. Code Ann. §§ 43-35-5 to -90 (2015).

[3] The Adult Protection Act permits law enforcement officials to take vulnerable adults into protective custody if there is (1) probable cause to believe there exists an imminent danger to the adult's life or safety by reason of abuse, neglect, or

Just before midnight, the on-call DSS case manager, Valorie McDaniel, met the ambulance at the hospital to receive Sellaro. McDaniel later testified that Sellaro was "confused" and "unable to provide [her] with a lot of information." Following their conversation, McDaniel requested a medical evaluation. An attending physician conducted the evaluation the following morning and found that Sellaro was alert and coherent, had no physical impairments, and had good short-term memory. On February 29, a psychiatrist, Dr. Jeffery Brandenburg, evaluated Sellaro and concluded he had no signs of dementia and was capable of making his own healthcare decisions.

DSS assigned Sellaro's case to Naqua Edgerton, a DSS caseworker. As required under the Adult Protection Act, a probable cause hearing was scheduled for Monday, March 1, at 1:00 pm. Safiya Tate, a hospital social worker who was assigned to the case, spoke to Edgerton on the phone around 11:00 am on March 1 and then faxed Sellaro's medical records, including Dr. Brandenburg's assessment, to Edgerton. Later, during the trial for Sellaro's present claims, Tate testified the purpose of faxing these documents to Edgerton was "for inclusion in the [probable cause] hearing so that they could make a good determination of whether or not [Sellaro] needed to remain in care or whether he was safe enough to discharge home alone."

Later that afternoon, the family court conducted a hearing to "determine whether there [was] probable cause for the protective custody." S.C. Code Ann. § 43-35-55(F). At this hearing, a RCSD representative testified that RCSD determined on the night of the accident that Sellaro was "unable to take care of himself, that the wife who was deceased was the actual caregiver." Despite the assignment of Sellaro's case to Edgerton by this point, McDaniel attended the hearing on behalf of DSS because she met him at the hospital following the initial EPC. McDaniel did did not testify, nor did she present to the family court the medical records that Tate had faxed two hours before. Sellaro did not attend the hearing. Ultimately, the family court found (1) there was probable cause for taking Sellaro into EPC and (2)

---

exploitation; (2) the adult does not consent to protective custody; and (3) there is not time to apply for a court order. S.C. Code Ann. § 43-35-55(A). Once law enforcement takes protective custody of an adult, it must transport the adult to a "place of safety," at which point DSS maintains custody "pending the family court hearing to determine if there is probable cause for protective custody." *Id.* § 43-55-(B).

probable cause *remained* for DSS to have custody of Sellaro pending a merits hearing.

Sellaro was confined in the hospital for six more days. Medical records dated after the hearing state: "Patient was admitted, against his will[,] due to DSS order. It is unclear why patient was placed under custody. He is not demented. No cognitive impairment and no inpatient physical needs. Contacted our legal team to notify of situation. No medical reason to be here." DSS ultimately agreed to dismiss its protective services action against Sellaro, at the request of Sellaro's court-appointed guardian ad litem (GAL), and he was discharged from the hospital on March 7.

On August 31, 2016, Sellaro filed this action against DSS for negligence and false imprisonment. During the three-day trial, Sellaro entered into evidence Dr. Brandenburg's and the attending physician's assessments from February 28 and 29 that stated Sellaro was capable of taking care of himself and did not have dementia. McDaniel, Tate, and Edgerton testified to the above events. McDaniel conceded on cross-examination that DSS had a responsibility to supply the family court with the medical reports available to it at the time of the hearing. McDaniel also conceded that she did not check to determine if the medical records had been faxed to DSS before the probable cause hearing. The jury returned a verdict finding that DSS was negligent and falsely imprisoned Sellaro and awarded Sellaro $300,000.

DSS filed motions for JNOV, or alternatively a new trial absolute or *nisi remittitur.* Following a hearing on July 28, 2022, the trial court denied the motions in a Form 4 order. This appeal followed.

## LAW AND ANALYSIS

### I.      Directed Verdict and JNOV

"When ruling on a directed verdict or JNOV motion, the trial court must view the evidence and the inferences that reasonably can be drawn from it in the light most favorable to the nonmoving party." *Hamilton v. Reg'l Med. Ctr.*, 440 S.C. 605, 626, 891 S.E.2d 682, 693 (Ct. App. 2023), *cert. denied*, S.C. Sup. Ct. Order dated May 1, 2024. "When reviewing a motion for directed verdict or JNOV, an appellate court must employ the same standard as the trial court." *Wright v. Craft*, 372 S.C. 1, 18, 640 S.E.2d 486, 495 (Ct. App. 2006). The appellate court will reverse the trial court's ruling only when no evidence supports the ruling or when an error of law controls the ruling. *Law v. S.C. Dep't of Corr.*, 368 S.C. 424, 434–35, 629 S.E.2d

642, 648 (2006). "An appellate court must affirm a trial court's denial of a directed verdict motion unless it determines the jury could not reasonably have found in favor of the nonmoving party." *Hamilton*, 440 S.C. at 627, 891 S.E.2d at 694.

## A. False Imprisonment

DSS argues the false imprisonment claim must fail because "there was probable cause as a matter of law" for the initial taking of Sellaro into EPC and for continued protective custody. DSS does not argue that probable cause existed on the merits. Rather, it claims the family court's finding of probable cause is dispositive and cannot be collaterally attacked, thus rendering the detention lawful. We disagree and hold the trial court did not err by denying the motions for a directed verdict and a JNOV on the false imprisonment claim.

False imprisonment is the "deprivation of a person's liberty without justification." *Caldwell v. K-Mart Corp.*, 306 S.C. 27, 30, 410 S.E.2d 21, 23 (Ct. App. 1991). To successfully prosecute a cause of action for false imprisonment, the plaintiff "must prove: (1) that the defendant restrained the plaintiff; (2) that the restraint was intentional; and (3) that the restraint was unlawful." *Andrews v. Piedmont Air Lines*, 297 S.C. 367, 371–72, 377 S.E.2d 127, 130 (Ct. App. 1989). The existence of probable cause to detain a person defeats a claim of false imprisonment. *See Jackson v. City of Abbeville*, 366 S.C. 662, 665, 623 S.E.2d 656, 658 (Ct. App. 2005). Probable cause is generally an issue of fact in South Carolina. *Wortman v. City of Spartanburg*, 310 S.C. 1, 4, 425 S.E.2d 18, 20 (1992) ("In South Carolina, the issue of probable cause is a question of fact and ordinarily one for the jury."); *Jones v. City of Columbia*, 301 S.C. 62, 65, 389 S.E.2d 662, 663 (1990) ("South Carolina follows the minority rule that the issue of probable cause is a question of fact and ordinarily one for the jury."). However, "[p]robable cause can 'be decided as a matter of law when the evidence yields but one conclusion.'" *Seabrook v. Town of Mount Pleasant*, 432 S.C. 441, 446, 853 S.E.2d 508, 511 (Ct. App. 2020) (quoting *Law*, 368 S.C. at 436, 629 S.E.2d at 649).

DSS argues that the existence of probable cause is "unassailable" because Sellaro cannot collaterally attack the family court order. This misconstrues Sellaro's claims. Sellaro does not contend that the probable cause order was facially invalid. Sellaro challenges *DSS's conduct* that led to the procurement of the order and not the order itself.[4] Sellaro asserts that, because of DSS's actions, the family court lacked

---

[4] As to DSS's argument that *Argoe v. Three Rivers Behavior Health, LLC* controls this case, we hold Sellaro's assertion that there was no probable cause for continued

access to the evidence necessary to determine at the 72-hour probable cause hearing whether probable cause for custody remained. Based on the evidence presented at trial, the jury could have reasonably found that probable cause for custody no longer existed when the 72-hour hearing occurred. Thus, because probable cause did not exist as matter of law, the trial court did not err by denying the motions for a directed verdict and a JNOV on the false imprisonment claim. *See Hamilton*, 440 S.C. at 627, 891 S.E.2d at 694 ("An appellate court must affirm a trial court's denial of a directed verdict motion unless it determines the jury could not reasonably have found in favor of the nonmoving party.").

## B. Negligence

---

protective custody is not precluded because there has been no final adjudication on the issue of custody. 392 S.C. 462, 710 S.E.2d 67 (2011). In *Argoe*, our supreme court held, in relevant part, the petitioner was barred from asserting any challenge to certain involuntary commitment orders to support her false imprisonment claim against a psychiatric facility because she did not appeal the order constituting a final adjudication on the validity of the commitment proceedings. *Id.* at 470–71, 710 S.E.2d at 71–72. Here, there was not a separate proceeding adjudicating the validity of the family court order, as there was with the involuntary commitment orders in *Argoe*. *Id.* at 470–71, 710 S.E.2d at 72. Additionally, we struggle to characterize the family court order itself as a final adjudication. A fundamental difference between *Argoe* and this case is that the commitment proceedings in *Argoe* culminated in a hearing at which the petitioner was represented by counsel and court-appointed medical examiners presented their findings. *Id.* at 467, 710 S.E.2d at 70. After that hearing, the probate court issued an order for continued treatment, which the petitioner never appealed. *Id.* Had Sellaro's case proceeded to a merits hearing, which would have required DSS to prove by clear and convincing evidence that he was a vulnerable adult in need of protective services, the resulting order would have constituted a final adjudication that Sellaro could have appealed directly to this court. *See, e.g.*, *S.C. Dep't of Soc. Servs. v. Patten*, 412 S.C. 93, 770 S.E.2d 192 (Ct. App. 2015) (holding DSS failed to prove by clear and convincing evidence that Patten was a vulnerable adult under the Adult Protection Act after he appealed the family court order that determined he was vulnerable adult following his merits hearing). But DSS voluntarily dismissed Sellaro's case before the merits hearing.

DSS argues the trial court erred by denying a directed verdict and a JNOV on the negligence claim because Sellaro produced no expert testimony concerning the standard of care. We disagree.[5]

To recover for negligence, a plaintiff must show (1) a duty of care owed by the defendant to the plaintiff; (2) a breach of that duty by a negligent act or omission; and (3) damage proximately resulting from the breach. *S.C. Ins. Co. v. James C. Greene & Co.*, 290 S.C. 171, 176, 348 S.E.2d 617, 620 (Ct. App. 1986). "The absence of any one of these elements renders the cause of action insufficient." *S.C. State Ports Auth. v. Booz-Allen & Hamilton*, 289 S.C. 373, 376, 346 S.E.2d 324, 325 (1986). "Generally, duty is defined as the obligation to conform to a particular standard of conduct toward another." *Moore v. Weinberg*, 373 S.C. 209, 221, 644 S.E.2d 740, 746 (Ct. App. 2007), *aff'd*, 383 S.C. 583, 681 S.E.2d 875 (2009). "If a duty does exist, the jury then determines whether a breach of the duty that resulted in damages occurred." *Id.*

In professional negligence cases, "expert testimony is *usually* necessary to establish both the standard of care and the professional's deviation from that standard, unless the subject matter is within the area of common knowledge and experience of the layman so that no special learning is needed to evaluate the professional's conduct." *City of York v. Turner-Murphy Co.*, 317 S.C. 194, 196, 452 S.E.2d 615, 617 (Ct. App. 1994) (emphasis added). "The application of the common knowledge exception depends on the facts of each case." *Id.* at 197, 452 S.E.2d at 617. The professional negligence standard typically applies in malpractice cases to physicians, accountants, and attorneys, or when the issue of breach requires specific professional knowledge. *See, e.g.*, *Hoeffner v. The Citadel*, 311 S.C. 361, 365, 429 S.E.2d 190, 192 (1993); *Kemmerlin v. Wingate*, 274 S.C. 62, 65, 261 S.E.2d 50, 51 (1979); *City of York*, 317 S.C. at 197, 452 S.E.2d at 617 (finding an expert was necessary to establish the standard of care because it would require "professional knowledge of construction methods" to determine whether an engineering company should have known of a defect).

DSS characterizes this case as one of professional negligence and argues expert testimony was required to define the standard of care and to determine

[5] DSS also argues that it "cannot be found negligent where there was probable cause to support its actions with respect to the EPC and continuation of custody." As stated above, we hold the family court order finding probable cause does not have a preclusive effect and the jury believed the evidence showing there was no probable cause to continue to detain Sellaro by the time of the 72-hour probable cause hearing.

whether DSS breached it here. But the negligence that is alleged here is "within the area of common knowledge" and "no special learning is needed" to evaluate DSS's conduct. *City of York*, 317 S.C. at 196, 452 S.E.2d at 617. The jury heard evidence that the purpose of the probable cause hearing is to determine whether the person in custody is in immediate danger. McDaniel, the DSS caseworker who attended Sellaro's probable cause hearing, testified that DSS has the responsibility to give the court accurate information available to it, the normal protocol is for a DSS representative to testify at these hearings, and she expected to testify. The jury also heard McDaniel admit that if Sellaro's medical records and evaluations had been "timely" transmitted to her, it would have been her "responsibility to put them in the [family c]ourt's hands." Finally, the jury heard McDaniel claim the medical evaluations "should have been done" before the probable cause hearing but that she did not check to see if they had been completed or if DSS had received any records.

We hold there was sufficient evidence for the jury to evaluate the standard of care owed to Sellaro and that DSS breached that standard. A layperson could fairly determine that the duty of care DSS owes to adults in its custody includes providing evidence to the family court that custody is unnecessary if DSS knows or should know of this evidence prior to the probable cause hearing. Thus, the trial court did not err by denying the motions for a directed verdict and a JNOV on the negligence claim.

### C. SCTCA Immunities

DSS argues the trial court erred by denying its motions for a directed verdict and a JNOV because it was entitled to absolute immunity under the SCTCA, specifically sections 15-78-60(3) and (4). We disagree.

Under section 15-78-60 of the South Carolina Code, government entities are immune from tort liability for a loss resulting from:

> (3) execution, enforcement, or implementation of the orders of any court or execution, enforcement, or lawful implementation of any process;

> (4) adoption, enforcement, or compliance with any law or failure to adopt or enforce any law, whether valid or invalid, including, but not limited to, any charter, provision, ordinance, resolution, rule, regulation, or written policies.

S.C. Code Ann. § 15-78-60(3), (4). "The burden of establishing a limitation upon liability or an exception to the waiver of immunity under [SCTCA] is upon the governmental entity asserting it as an affirmative defense." *Steinke v. S.C. Dep't of Lab., Licensing & Regul.*, 336 S.C. 373, 393, 520 S.E.2d 142, 152 (1999). "The provisions . . . establishing limitations on and exemptions to the liability of [government entities] . . . must be liberally construed in favor of limiting the liability of the State." *Wright v. S.C. Dep't of Transp.*, 437 S.C. 184, 198, 877 S.E.2d 788, 795 (Ct. App. 2022) (quoting S.C. Code Ann. § 15-78-20(f)).

Here, DSS's tortious conduct occurred *before* the family court found probable cause. Thus, section 15-78-60(3) cannot shield DSS from liability, and the trial court did not err by denying the motions for a directed verdict and a JNOV under this provision. *See Wortman*, 310 S.C. at 3, 425 S.E.2d at 20 (holding that, because the plaintiff was arrested before a warrant issued, the actions of the police did not occur during the execution or enforcement of a court order and section 15-78-60(3) did not shield a government entity from liability).

With regard to subsection four, technically, DSS's argument for immunity may be unpreserved because DSS did not raise this specific provision during its directed verdict motion at trial.[6] However, we hold the question is nonetheless preserved because a contrary application of the preservation rule may be "hyper-technical" and would suppress consideration of an otherwise meritorious issue, particularly given the issue was raised to and ruled upon by the trial court at the JNOV hearing and no objection was made that DSS failed to raise this specific provision at trial. *See State v. Morales*, 439 S.C. 600, 609, 889 S.E.2d 551, 556 (2023) (noting that appellate courts are to be "mindful of the need to approach issue preservation rules with a practical eye and not in a rigid, hyper-technical manner" and thus, should not apply preservation rules in a manner that "elevat[es] form over substance to trap trial lawyers so as to prevent the appeal of a legitimate issue" (quoting *Herron v. Century BMW*, 395 S.C. 461, 470, 719 S.E.2d 640, 644 (2011))).

As to the merits of this argument, we hold DSS is not entitled to immunity under section 15-78-60(4). DSS claims "the record is conclusive that [DSS] enforced and complied with the procedures established by statute." DSS's duty to investigate begins upon notification by law enforcement that a vulnerable adult has

---

[6] In an appeal of the grant or denial of a directed verdict, an appellant is confined to the specific grounds raised in the motion at trial. *See Chreech v. S.C. Wildlife and Marine Resources Dep't.*, 328 S.C. 24, 34, 491 S.E.2d 571, 576 (1997).

been taken into protective custody. S.C. Code Ann. § 43-35-55(G) ("Upon receiving notification that a vulnerable adult has been taken into protective custody[,] the Adult Protective Services Program *shall commence an investigation*." (emphasis added)). This duty includes an inherent responsibility to provide evidence to the family court that rebuts the need for continued custody when DSS is aware of or should be aware of this evidence at the time of the probable cause hearing.

DSS attempts to absolve itself of any responsibility until the merits hearing.[7] *See Id.* § 43-35-45(C) (requiring a hearing on the merits within forty days of the filing of a petition for protective services). But the statute governing the EPC procedure places custody with DSS pending the *probable cause hearing*, not the merits hearing. *Id.* § 43-35-55(B). DSS's construction of its statutory obligation erases the purpose of the 72-hour probable cause hearing to determine if probable cause for custody *remains*.[8] Vulnerable adults are not represented at the probable cause hearing. DSS is the only party that can prevent unnecessary custody in situations like this one, where in the time between the initial EPC and the probable cause hearing, it becomes clear that there is no need for continued custody. DSS cannot claim to have complied with the Adult Protection Act when evidence available to it at the time of the probable cause hearing refuted the need for protective custody and it failed to present this evidence to the family court. Thus, we hold DSS is not immune from tort liability under subsection four of section 15-78-60 of the SCTCA for compliance with any law and the trial court did not err by denying the motions for a directed verdict and a JNOV on the immunity issue.

---

[7] DSS claims it is required to conduct a comprehensive evaluation prior to the merits hearing but that no such evaluation is required prior to the probable cause hearing. We do not hold that DSS *must* conduct a comprehensive evaluation prior to the probable cause hearing, as this will not be possible in every case, particularly if the hearing occurs immediately after or on the same day as the initial EPC. We only hold that when DSS has access to records from an evaluation that occurred prior to the hearing, it must provide the family court with this evidence. Thus, DSS did not comply with the statute *in this case* because it had access to results from an evaluation it requested that occurred before the probable cause hearing and it did not provide the records to the family court or testify about the results.

[8] DSS's insistence that it may sit on its hands until the merits hearing—even when it knows or should know that custody is unnecessary—contradicts the directive of the Adult Protection Act to provide services "in the least restrictive setting available." S.C. Code Ann. § 43-35-45(F); *see also Patten*, 412 S.C. at 100, 770 S.E.2d at 196 (noting DSS's responsibility to ensure an adult "does not spend any more time in custody than absolutely necessary").

## II. New Trial

### A. Submission of Immunity Defenses to Jury

DSS argues the trial court erred by denying its motion for a new trial because the trial court "erroneously delegated to the jury [a decision on] the merits of the immunity defense." South Carolina courts do not follow the "plain error" rule on appeal. *See State v. Sheppard*, 391 S.C. 415, 421, 706 S.E.2d 16, 19 (2011). "Instead, a party must have a contemporaneous and specific objection to preserve an issue for appellate review." *Id*. An issue may not be raised for the first time in a motion for a new trial. *McGee v. Bruce Hosp. Sys.*, 321 S.C. 340, 347, 468 S.E.2d 633, 637 (1996). DSS never objected at trial when the trial court agreed to charge the jury with the immunity provisions at the request of RCSD. Thus, regardless of whether the trial court erred by charging the jury with the asserted immunities, the issue is unpreserved.

### B. Damages Award Unsupported by Evidence

"[T]he jury's determination of damages is entitled to substantial deference." *Welch v. Epstein*, 342 S.C. 279, 303, 536 S.E.2d 408, 420 (Ct. App. 2000); *accord Jolly v. Fisher Controls Int'l, LLC*, 443 S.C. 511, 523–24, 905 S.E.2d 380, 387 (2024). In reviewing the trial court's ruling on a new trial motion based on the amount of the jury's verdict, appellate courts give great deference to the trial court because it heard the evidence and "possesses a better-informed view of the damages." *Hamilton*, 440 S.C. at 638, 891 S.E.2d at 700 (quoting *Vinson v. Hartley*, 324 S.C. 389, 405–06, 477 S.E.2d 715, 723 (Ct. App. 1996)). "The trial [court] must grant a new trial absolute if the amount of the verdict is grossly inadequate or excessive so as to shock the conscience of the court and clearly indicates the figure reached was the result of passion, caprice, prejudice, partiality, corruption[,] or some other improper motives." *Vinson*, 324 S.C. at 404, 477 S.E.2d at 723. Accordingly, the decision to grant a new trial is left to the sound discretion of the trial court and generally will not be disturbed on appeal." *Wright*, 372 S.C. at 36, 640 S.E.2d at 505.

DSS first argues the amount of the jury verdict is unsupported by the evidence because the only evidence of economic harm consisted of $9,291 in medical bills and Sellaro offered no evidence to establish any physical manifestation of emotional distress. This argument is unpreserved because DSS did not object to the trial court's charge on damages, which included non-economic damages, and instead raised it for

the first time in its motion for a new trial. *See Bowen v Johnson*, 252 S.C. 423, 427, 166 S.E.2d 766, 768 (1969) (determining that the defendant's contention that he was entitled to a new trial because actual damages should have been limited came "too late for consideration" when "the jury was allowed to consider, without objection, all elements of damage proved by the plaintiff")

DSS further argues the verdict is grossly excessive. We disagree. The record includes evidence that Sellaro remained in state custody against his will for nine days, was confined to a hospital for no medical reason, and was subject to medical exams and lab tests. While in custody, he lost the opportunity to see his wife's body one last time and to attend her funeral. We hold the verdict of $300,000 is not so shockingly disproportionate that it indicates the jury was motivated by passion, caprice, prejudice, or any other consideration not founded on the evidence. The damages award was not grossly excessive as to shock the conscience, and the trial court did not abuse its discretion by failing to grant a new trial absolute. *See, e.g., Caldwell*, 306 S.C. at 32–33, 410 S.E.2d at 24–25 (holding a jury award of $75,000 for false imprisonment was not motivated by caprice or passion when the plaintiff was detained for fifteen minutes inside a K-mart); *Zimbelman v. Savage*, 745 F. Supp. 2d 664, 683 (D.S.C. 2010) ("In a suit for false imprisonment, the basic injury is the depreciation of the [p]laintiff's liberty. Such things as humiliation, indignity, and mental suffering are general damages that naturally and proximately result from false imprisonment." (citations omitted)).

### C. Verdict Unduly Liberal

When determining whether the jury's verdict is excessive, the trial court must give "substantial deference" to the jury's determination of damages because "[t]he right of a trial by jury shall be preserved inviolate." *Jolly*, 443 S.C. at 523, 524, 905 S.E.2d at 387 (first quoting *Rush v. Blanchard*, 310 S.C. 375, 379, 426 S.E.2d 802, 805 (1993); and then quoting S.C. Const. art. I, § 14). "Thus, every party to a civil jury trial 'is entitled to the constitutional privilege of the fair judgment of a jury' and a court must 'not interfere with the verdict of a jury simply because it is greater [or less] than its own estimate.'" *Id.* at 524, 905 S.E.2d at 387 (alteration in original) (quoting *Brabham v. S. Asphalt Haulers, Inc.*, 223 S.C. 421, 430, 76 S.E.2d 301, 306 (1953)). "A motion for new trial *nisi remittitur* asks the trial court in its discretion to reduce the verdict because it is merely excessive, although not motivated by considerations such as passion, caprice[,] or prejudice." *Welch*, 342 S.C. at 303, 536 S.E.2d at 420. "In considering a motion for new trial *nisi*, the trial court must evaluate the adequacy of the verdict in light of the evidence presented." *Id.* "The

[court]'s decision will not be disturbed on appeal unless it clearly appears the exercise of discretion was controlled by a manifest error of law." *Id.*

For the reasons discussed above, the trial court did not abuse its discretion by failing to grant a new trial *nisi*. While the verdict of $300,000 is large, we hold the trial court properly evaluated the adequacy of the verdict and that its decision to deny the motion for *remittitur* was not controlled by an error of law.

## CONCLUSION

For the foregoing reasons, the trial court's order is

**AFFIRMED.**

**KONDUROS, GEATHERS, and TURNER, JJ., concur.**